DONALD MACLEAN v. JAMES E. SCRIPPS.

*Libel—Evidence as to illicit intercourse—Photographic fac similes—Denial of guilt—Motive—Legal malice—Special verdict—Conduct of counsel.*

1. A physician accused of illicit intercourse with a patient sued his defamer for libel. *Held*, that he could show the patient's physical condition as bearing on the probability of the charge. But in contradicting the patient's testimony that she was weak and sick at home, the defence were properly confined to that issue, and it was not error to exclude their testimony as to her mode of employment there and her visiting elsewhere.

2. Photographic copies of handwriting are inadmissible as evidence of existing documents if the originals can be had.

3. Testimony that on a certain occasion a person had not denied guilt is properly excluded if evidence is admitted of all that was said and done, and the inferences are left to the jury.

4. In an action for newspaper libel, the motive of a subordinate in publishing the article complained of is irrelevant if not communicated to his principal, the defendant, and if a showing has been made of everything that passed between principal and subordinate before publication. And where the defendant besides testifying that he had no ill-will toward plaintiff and did not know him, and that he had put implicit confidence in his subordinate, had also been allowed to show all that took place before the publication, and the information on which he acted, there was no material error in excluding a question as to whether he had any purpose to injure plaintiff in assenting to the publication especially where it was put by his own counsel in cross-examining him when called by the plaintiff to show his control of the paper.

5. The willful publication of injurious statements involves the design to produce whatever injury must necessarily follow ; and when done

purposely, knowingly and for no good purpose or justifiable end, it is malicious in the sight of the law even if done without any actual personal ill-will.

6. A general verdict was given for the plaintiff in a libel suit based on the republication of statements already published in Canada, and affecting the reputation of plaintiff who was a professor in the University of Michigan. The jury were then asked specially whether the publication had been made because the charges had been published generally in Canadian papers, injuriously affecting, in plaintiff's opinion, the best interests of the University and for the purpose of calling attention thereto as a matter of public duty and in order that there might be a public investigation by the regents of the University. The jury answered, as to previous publication, " We say, not generally to his knowledge, the evidence only going to show he had seen the two Tilsonburg papers "—and as to the purpose of the republication they answered negatively. They afterwards answered the whole question in the negative. *Held*, that the answers were legally identical.

7. Where a jury answered a special question by saying they had no means of knowing, and that they did not know from the evidence, and afterwards answered simply that they did not know, and court and counsel treated the answer as a negative, it was so treated in the appellate court.

8. The power of the Supreme Court to review the action in a circuit court on the trial is derived entirely from the statute and common-law practice on bills of exceptions ; and if the action of the circuit court has not been excepted to the Supreme Court cannot review it.

9. Where the course of counsel in addressing the jury has not been excepted to and ruled on, the Supreme Court can not review it even though recited in the bill of exceptions.

10. A false and injurious publication made in a public journal "for sensation and increase of circulation " is, in a legal sense, malicious.

11. A jury was instructed that their answers to special questions must conform to their general verdict or they would overrule it. *Held*, that if this was misleading as giving the general verdict precedence it was too late to object to it after the jury had retired and when the judge could not correct it.

12. Rehearing will not be granted on the ground that a son of the judge who wrote the opinion belonged to a firm who were attorneys of record for one of the parties when the suit was brought, especially if the firm did not manage the case and did not appear in the appellate court.

Error to the Superior Court of Detroit. (Chipman. J.) Oct. 12.—Dec. 21.

CASE. Defendant brings error. Affirmed.

*John Atkinson, Henry W. Montrose* and *Isaac Marston* for appellant. While malice may sometimes be inferred from a privileged publication (*Atkinson v. Free Press* 46 Mich. 383; Odger's Law of Libel 280; *White v. Nicholls* 3 How. 287; *Thomas v. Croswell* 7 Johns. 264; *Wright v. Woodgate* 2 C. M. & R. 573; *Cooke v. Wildes* 5 E. & B. 328; *Shurtleff v. Stevens* 51 Vt. 501 : 31 Am. 707; *Woodward v. Lander* 6 C. & P. 548) it may not unless the language is a clear abuse of the privilege : *Somerville v. Hawkins* 10 C. B. 583; *Spill v. Maule* L. R. 4 Exch. 232; *Laughton v. Bishop of Sodor and Man.* L. R. 4 P. C. App. 505; *Taylor v. Hawkins* 16 Q. B. 322; Folkard's Starkie § 575; and the malice which makes it an abuse must be malice in fact : *Clark v. Molyneux* 3 Q. B. Div. 237; *Capital Counties Bank, v. Henty* 5 C. P. Div. 515; *Fitz Gerald v. Campbell* 15 L. T. 75; *Lister v. Perryman* L. R. 4 H. L. 521 : 3 Exch. 197; *Edwards v. Chandler* 14 Mich. 475; a verdict is bad if the answers to special questions do not correspond to it : *Cole v. Boyd* 47 Mich. 98 ; *Selleck v. Griswold* 49 Wis. 48 ; it is a duty to expose facts affecting the public interests : *Palmer v. Concord* 48 N. H. 216; *State v. Burnham* 9 N. H. 41; *Kelly v. Sherlock* L. R. 1 Q. B. 689 ; *Kelly v. Tinling* id. 699; *Henwood v. Harrison* L. R. 7 C. P. 622; *Toogood v. Spyring* 1 C. M. & R. 181; *Whitely v. Adams* 15 C. B. (N. S.) 417; *Gott v. Pulsifer* 122 Mass. 235; *McBee v. Fulton* 47 Md. 403; as to abuses by counsel in opening and closing, see *Forsyth v. Cothran* 61 Ga. 278; *Tucker v. Henniker* 41 N. H. 322; *Brown v. Swineford* 44 Wis. 290; *Rolfe v. Rumford* 66 Me. 564; *Koelges v. Insurance Company* 57 N. Y. 638; *Martin v. Orndorff* 22 Ia. 504; *Hoxie v. Insurance Company* 33 Conn. 474.

*Russel & Campbell, Levi T. Griffin* and *Otto Kirchner* for appellee. Opinions as to handwriting cannot be based on photographs : *Tome v. Railroad Company* 39 Md. 93; *Taylor's Will Case* 10 Abb. Pr. (N. S.) 300; *Ebron v.*

*Timpleman* 47 Tex. 503; actual intention to injure need not be proved against a defendant in a libel suit: *Barr v. Moore* 87 Penn. St. 385; *Pennington v. Meeks* 46 Mo. 217; *Buckley v. Knapp* 48 Mo. 152; *Rodgers v. Kline* 56 Miss. 808; *Haley v. State* 63 Ala. 89.

CAMPBELL, J. The issues in this case, although several assignments of error appear in the record, were mainly rested on a few classes of questions. The libel sued on, which contained recitals tending to show that plaintiff, while a medical professor in the University, had illicit relations with a Canadian lady patient and kept up an obscene correspondence with her, was claimed by defendant to have been published under circumstances rendering him legally blameless. The plea of not guilty was accompanied by a notice which relied *first*, on privilege, resting on the previous publication in Canadian newspapers, without contradiction, and the right of the press to make the charges public as affecting the good fame and interests of the University, and as requiring investigation; *second*, the truth of the charges; and *third*, accord and satisfaction.

No errors are assigned bearing on the last two questions except as they relate to matters of evidence. The question of privilege and the treatment of it by the court are the main questions apart from the incidental interlocutory ones as to rulings of various kinds.

The court below held that the publication was in its nature privileged, and that the plaintiff had the burden of showing both its falsehood and that it was not published with proper motives. This ruling renders several questions unimportant and considerably narrows the legal issues.

Upon the question of truth the plaintiff introduced a considerable amount of testimony concerning the state of health of the lady in question, and also to account for her history while at Ann Arbor. The methods of proof on this subject appear to have been the usual ones, and admissible if the facts of her condition were pertinent at all. We think her physical condition as affected by the diseased state

described was pertinent to the inquiry and had some bearing on the probabilities. Its weight, of course, would depend on its relation to other facts introduced on the question of innocence. Complaint is made that defendant was not allowed to contradict her sickness by evidence of her condition at her home thereafter. The court excluded testimony in regard to her employment at home and visiting, but told counsel they might contradict her evidence as to her weakness and sickness there. This they did not see fit to do. This was the only question relevant to contradict what had been shown for plaintiff, and there was no error in confining the testimony to that issue.

The chief controversy centered upon the genuineness of a scurrilous letter written over a fictitious signature and addressed to C. D. Brenton, at Tilsonburg, the home of Mrs. Wardle, the lady in question. The theory of the defense was that plaintiff wrote it in Kingston and sent it to Mrs. Wardle under that assumed name. The handwriting of this letter was therefore the most important matter involved in the whole case. If plaintiff wrote it he had no cause of action. All of the charges in the libel originated in what was said and done about this letter.

The handwriting was made the subject of testimony from persons proving it in the ordinary way from personal familiarity with the plaintiff's writing, and by experts on both sides giving testimony from its appearance by comparison. So far as the former kind of evidence is concerned there are no rulings which are peculiar, or which in our opinion require special consideration. But there was an exclusion of certain expert testimony of which complaint is made as being very important, and as improperly ruled out. This is contained in a number of depositions in which the experts undertook to determine identity of hands from a number of photographs of letters, including the Brenton letters and some letters claimed to have been genuine letters of plaintiff.

The originals of these papers were not claimed to be lost or out of reach. The fact that there were photographs pro-

duced, claimed to be from the originals, of itself indicates that no such difficulty probably existed, and the case was not claimed to depend on any impossibility of producing them. No authority seems to justify the proof of the handwriting of obtainable originals, by any species of imitation or copy. That photography may be used to obtain close imitations is no doubt true. But it is not a recognized fact that all of the appearances of a written document are capable of such exact reproduction that the copy will fully represent the original. It is the original paper which in this case raised all the difficulty. The proof to be admissible must relate to that. We do not think that secondary evidence was admissible. This question was before us in the *Foster Will Case* 34 Mich. 23, where our view was as now expressed. *Hynes v. McDermott* 82 N. Y. 49 is an instructive case in the same direction. Some other cases of similar purport were cited on the argument. We do not think the court erred in this ruling.

It is also objected that the defendant was not allowed to show that in the domestic disturbances attending the production of the Brenton letters, Mrs. Wardle did not deny the charge of her guilt. How far these facts were admissible in this suit is not now important, because the court below admitted proof of all the circumstances so far as relevant to Mrs. Wardle's testimony, and only required proof of what was said and done, leaving the inferences to be drawn by the jury. There was no ruling which prevented the jury from becoming acquainted with all that the witnesses could say on the subject of express or implied confessions, or denials so relevant.

It is also urged that defendant was not allowed to prove his own motives and those of his subordinate McVicar in publishing the article. The error assigned as to McVicar was that he was not allowed to answer the single question, " Why was this article published ?" That as to Scripps was, that having been called by the plaintiff to show his interest in and control over the paper, and his publication of a subsequent article referring to this libel suit, he was asked

on cross-examination by his own counsel : "Will you state whether you had any purpose to injure him (plaintiff) in assenting to the publication, or on other grounds?" This was objected to as not proper cross-examination, and also that if the article was privileged it must justify the grounds. The court ruled it out.

So far as McVicar's motive was concerned it could not affect defendant one way or the other, except as communicated to defendant for his information. The court allowed all that passed between McVicar and defendant before the publication to be shown fully. This was all that could be relevant here. So far as Scripps is concerned he also was allowed to show all that occurred previous to the publication and the information on which he acted. He testified that he put implicit confidence in McVicar's statement, and that he had no ill-will against plaintiff; and did not know him and had never seen him. After this testimony it is difficult to see how he was injured by the exclusion of the other question. It would not probably have been error to allow it, but aside from its being put on cross-examination upon a different issue, the facts already drawn out rendered it of no further consequence beyond repetition. If the facts existing were such as to render the publication proper, the motives already indicated, if believed, would under the charge of the court dispose of any such question.

The chief discussion of law is on the question of privilege. Defendant claims the article was absolutely privileged. The court held it was privileged unless shown to be both false and published without good motives and maliciously.

That a person may publish falsehoods of another who occupies a position in which his conduct is open to public scrutiny and criticism, without any reference to the object to be secured by the publication, is a doctrine which has no foundation that we have been able to discover. Whether this article, taken as a whole, was privileged until reason was shown to the contrary, is not now important, and need not be discussed, because the plaintiff is not the complaining party, and the ruling below went as far as possible to

hold it so. That the privilege is lost by malice is elementary law in such cases. The question which the court below discussed, and which is discussed here, is whether the malice must be actual personal ill-will to plaintiff, or whether the publication of what is necessarily injurious and done purposely and knowingly, and not for any good purpose or justifiable end, is legally malicious within the law of libel.

Upon this we think there is no room for serious question. The term " malicious " cannot be improper to designate a willful injury without just reason. It is not claimed that there is any room to question the injurious character of this article. Neither can it be questioned that the willful publication of it necessarily involves a design to produce such injury as is a necessary consequence of it. This being so, it would be a violation of all the analogies of legal language to hold that a willful injury is not malicious if made without any good cause. The Constitution, in regard to criminal prosecutions for libel, restricts the defense of truth to cases where the libel, even though true, is published for good motives and justifiable ends. This is only another form of saying that malicious publications are not privileged from criminal prosecution, even if true. In civil cases the truth is always privileged, but in cases of false charges their publication, if privileged, must be privileged by the occasion. Private reputation cannot be left exposed to wanton mischief without redress, and a doctrine that would put the reputation of strangers on a worse footing than that of acquaintances cannot be sound. The reiterated cautions concerning the presumption in favor of privilege left no ground for complaint as to the burden which was laid on plaintiff throughout. It may be noted that the defendant's notice of defense is framed on this theory.

Complaint is also made concerning the action of the court touching certain questions put to the jury. The jury returned a general verdict for plaintiff. At the same time they answered a question whether the publication was made because the article had been published generally in Canadian papers injuriously affecting, in defendant's opinion,

the best interests of the University of Michigan, and for the purpose of calling attention thereto as a matter of public duty, and in order that there might be a public investigation by the regents;—to the first clause, "We say not generally to his knowledge, the evidence only going to show he had seen the two Tilsonburg papers." The remainder they answered negatively. To the inquiry concerning any other or further motive they answered: "Sensation and increase of circulation." To a third question, as to acquaintance with the plaintiff, they answered they did not know of any from the evidence, but that he must have known plaintiff by reputation. As to spite, malevolence, ill-will or enmity of heart entertained by defendant, they said they had no means of knowing.

In answer to questions put by plaintiff, they answered in separate answers that defendant published the article in disregard of plaintiff's rights and reputation, not caring whether it was true or false; that he did it to create a sensation, and without any investigation of the truth of the charge.

Upon being sent back, by the acquiescence of both parties, to answer defendant's third and fourth questions more distinctly, the court instructed them upon every question to answer yes or no, and to answer no on any question on which they were not satisfied. On their return they again answered the third and fourth questions by saying they did not know, and the first question, as a whole, in the negative.

These new answers were, in our opinion, identical legally with the first answers, and as court and counsel all agree that answering that they did not know was equivalent to a negative, we have no doubt that this is correct. Treating it as such, there is nothing in any finding inconsistent with the general verdict, unless upon the defendant's theory of privilege, which, as already said, we do not think correct.

The only remaining questions which have any importance relate to alleged abuses of counsel in their addresses to the jury, which it is claimed made reference to things entirely improper. We have, however, no means of considering

these questions. They form no part of the common-law record, and although the bill of exceptions recites the matters complained of, there was no ruling of the court and no exception. We have no right, under bill of exceptions, to review anything but such action of the court itself as is excepted to. The power of this Court to review the action in circuit courts on trials is one derived entirely from the statute and common-law practice on bills of exceptions. The law has left all things not legitimately belonging to exceptions to be managed by the circuit courts in furtherance of their own authority. We have no more power to review what they have not passed upon, than to exercise original jurisdiction in civil matters. It would be going entirely beyond our authority to notice what has not been ruled on and excepted to below.

The judgment must be affirmed with costs.

GRAVES, C. J. and COOLEY, J. concurred.

SHERWOOD, J., dissenting. This suit was commenced on the 16th day of September, 1882. The plaintiff in this case was a physician and surgeon, and a professor of surgery in the University of Michigan, and had been during the previous ten years. He brought his suit against the defendant for libel, in the Superior Court of the city of Detroit, for the publication of an article in the *Evening News* on the 11th day of September, 1882, and recovered damages in the sum of $20,000. The defendant was the controlling editor and publisher of the *Evening News* of the city of Detroit, a daily paper having at the time of the publication complained of a circulation of over 35,000 copies.

The declaration counts upon the malicious publication by the defendant of the following article, which plaintiff alleges is a false, scandalous and defamatory libel of and concerning him, viz.:

## "DEBAUCHERY AND RUIN.

### THE SAD STORY OF A CRAZED HUSBAND AND BROKEN FAMILY.

#### THE WRECK OF A CANADIAN HOME CHARGED TO A MICHIGAN UNIVERSITY PROFESSOR.

"For a month past a tale of debauchery and ruin, in which Michigan is interested, has been going the rounds of the Canadian press, and should have come to the knowledge of some of the regents of the Michigan University, the good name of which institution is being seriously compromised in the story as told. It is the subject of much talk at Ann Arbor, as a *News* reporter found on visiting there a few days ago to make inquiry as to the ' physician ' or ' professor' referred to in the Canadian press in this connection. The story as told by the Tilsonburg, Ont. papers is substantially as follows:

"Sometime ago a respectable farmer and stock-dealer of Dereham township, Oxford county, Ont. named Joseph P. Wardle,

#### TOOK HIS WIFE TO ANN ARBOR

to be treated for cancer, of which, it seems, she was finally cured and returned home, though not before making familiar acquaintance with her physician. Mrs. Emily Wardle had a cousin, a Mrs. Hotchkiss, who resided at Ann Arbor, but whom for some reason Mr. Wardle did not wish his wife to visit; and when she returned to Ann Arbor subsequently it was ostensibly to consult the physician regarding her health. In the fore-part of July last, while at her home in Dereham, Mrs. Wardle received from Ann Arbor a letter from Mrs. Hotchkiss, notifying her that she (Mrs. H.) would shortly pay her a visit, and saying, ' If you don't tell any stories about me, I won't tell any stories about you and the doctor.'

"It appears that prior to this time Wardle had some suspicion of his wife's fidelity, and having seen this letter, the expression above quoted confirmed them in a measure, and he determined to

#### WATCH HIS WIFE CLOSELY.

On Wednesday, July 26, he called at the post-office in Tilsonburg for his mail, which was handed him. On looking it over he found a letter addressed to ' C. D. Brenton,' which he returned to the clerk, saying it was not for him. But the

clerk assured him that Mrs. Wardle always asked for and received the letters so addressed, when the husband's suspicions were further aroused, and he kept the letter, opening and reading it at the first opportunity. The letter contained no date, but the envelope was postmarked Kingston, July 24, and had evidently been mailed at Kingston, Ont. on Sunday, and forwarded by the early morning train of Monday, July 24. Its contents revealed to Mr. Wardle full

### PROOF OF HIS WIFE'S INFIDELITY

to her marriage vow, and on returning to his home in no enviable frame of mind he charged her with lewdness, and she did not deny her entanglement with the doctor. The injured husband then ordered his unfaithful spouse to leave the house, giving her all the personal property she claimed as belonging to her, and furnishing her with $308 in cash. She was driven to Woodstock, where she took a Great Western train to Michigan, and is supposed to have gone to Mrs. Hotchkiss at Ann Arbor.

"The editor of the Tilsonburg *Observer* obtained a copy of the Kingston letter above referred to, and which was signed, 'Devotedly yours, John E. Wellcorn, Kingston, Ont.' and says that the language it contained was most disgusting (unfit for publication)—

### AN AWFUL LETTER

to be seen by a husband addressed to his wife, and with the assurance that she was receiving such regularly. The editor further asserts that on comparing the original letter, signed as above, with others received from the Ann Arbor physician by Mrs. Wardle, no one can for an instant doubt that all were written by the same person; besides, Mrs. Wardle had told her husband previously that this physician was in Kingston, and that she expected him to visit them on his way to Michigan.

"Five days after this terrible discovery, on Monday evening, July 31, Mr. Wardle left for Buffalo by the Canada Southern road with a load of lambs, but before he reached that city his troubles had

### DRIVEN HIM CRAZY

and at 2 o'clock in the morning of August 1, the conductor telegraphed ahead for help to secure the unfortunate man when the train should reach its destination. On arrival at Buffalo Wardle had become so violent that he broke loose

52 MICH.—15

from those in charge of him, hurled himself in front of a moving train, and would have been killed but for being seized by a powerful man and jerked from the track. He was sent back to Tilsonburg the same day, and on Wednesday, August 2, on information laid by his daughter, was sent to Woodstock jail, to be kept under proper restraint until arrangements could be made for his admission to and proper care

### IN THE LUNATIC ASYLUM

at London. Dr. Joy, of Tilsonburg, expressed a hope that his insanity would disappear after a time, and his mental balance be restored, as the actual cause of the attack was loss of sleep, the poor man not having slept or rested an instant from the time he read the fatal letter.

"The Tilsonburg *Liberal* makes some quotations from letters previously received by Mrs. Wardle from the physician, and adds: 'Whether this is the correct way for physicians to correspond with patients, we leave it with the reader to say.' Other letters were discovered, but the daughter of Mr. and Mrs. Wardle, a young lady, destroyed the most of them. A letter to Mr. Wardle was found, however, containing a sort of apology from the doctor for the interest taken in Mrs. Wardle's illness.

### ENSNARED BY THE RASCAL.

"The *Liberal* is informed, on good authority, that Mrs. Wardle was not afflicted in any way whatever, but had been ensnared in this rascally physician's affection, and could not resist the temptation of paying him an annual visit, and adds: 'If professors of this description are to be kept at the head of important institutions, the usefulness of hospitals, etc. will soon be gone. And what certainty and security is there for the safety of any man's wife or daughter's character being left untarnished after once visiting them for the treatment of any disease whatever? It is to be hoped that this matter will be looked into, and if the professor is guilty we will have great pleasure in making his name public.'

### WARDLE STILL INSANE.

In reply to an inquiry by telegram from the *News*, the following special dispatch was received this afternoon from the Tilsonburg *Observer*:

'TILSONBURG, ONT., Sept. 11.

Mr. Wardle has not yet recovered sanity. No new developments here in the scandal.'"

To the plaintiff's declaration defendant pleaded the general issue, and accompanied the same with a notice that he would show on the trial (1st) that before the publication of the article complained of, and on the 3d day of August, 1882, the statements and charges therein contained were published in several newspapers published and circulated extensively throughout the province of Ontario, in Canada, and in numerous other papers published in said province and extensively circulated therein, and also in Michigan; and that the plaintiff, during the whole of the time of said publication, was at the city of Kingston, in said province, and knew of the publication of the charges, and actually saw the article in one of said papers, and that he maintained silence in relation thereto, and took no action to contradict the statements or vindicate his reputation or that of the University of Michigan, wherein he was retained as professor, and which was thereby being disgraced; further, that the authorities of the University had taken no action in regard thereto, to learn of the truth or falsity of said charges, although the people of the State were largely interested in its good name, fame and credit; and it was therefore a matter of public concern and to which the public attention should be called. That the defendant, well knowing the premises, and the injury such reports would have upon the University, and believing the attention of the people should be called to the matter, published the alleged libelous article as a matter of great public interest and concern, and therefore insisted that the article was privileged. (2d) That the statements in the alleged libelous article were true. (3d) That after the publication of the article counted on, and on the 12th day of September, 1882, upon complaint being made by defendant that he had been injured by the publication of the article, the defendant offered to do anything reasonable in the premises to satisfy the plaintiff for any injury done him; and then and there agreed to publish an article such as the plaintiff should dictate, which was to be in full satisfaction for all injuries done him by the publication of the article counted on; and that in pursuance of the

agreement an article was dictated by the plaintiff and published by the defendant in the *Evening News* on the 13th day of September, 1882.

In pursuance of the order of the circuit court the defendant filed a bill of particulars òf the matters relied upon under his plea of justification. The general verdict was accompanied by special findings of fact in response to questions presented to the jury by counsel on both sides, and submitted to them under special instructions relating to the same. The record contains a bill of exceptions purporting to give the substance of all the testimony in the case. The defendant assigns sixty-six errors. In the sixty-second assignment it is claimed no testimony was offered by plaintiff to maintain the statements of his counsel in his opening, of plaintiff's wide-spread and great reputation. There was sufficient testimony offered tending to support this statement.

Counsel for plaintiff, in his opening to the jury, in stating the character of the *Evening News* and its conduct by the defendant, said : " This has been an extraordinary publication from the outset. It has not been a mere chronicler of news, * * * but in its own peculiar way it has pandered to passions," * * * and " to the public appetite for vile, indecent slanders upon reputable men in this and other communities. * * * It has been the boast of its editors and publishers, from the time the sheet was started, that it could afford to pay the damages awarded in actions of libel, by reason of the increased circulation which the publication of those libels would give it. Soon after the publication of this sheet began, libel suits rained down upon it like hail. Action after action and prosecution after prosecution followed, and then James E. Scripps thought it advisable to shield himself under the cover of a corporate organization," called "The Evening News Association," and under that shield he has continued the publication of the paper.

The vile letter mentioned in the alleged libelous article was addressed to C. D. Brenton, and to account for letters

being received by Mrs. Wardle, at the post-office, directed to that name, counsel for plaintiff, in his opening to the jury, stated that in the year 1881 Mrs. Wardle formed the acquaintance of a Miss A. G. Brenton, who lived in Hamilton, and afterwards in the city of Detroit, and asked the young lady to correspond with her, which she consented to do; that Mrs. Wardle wrote to Miss Brenton, but instead of addressing her letters to A. G. Brenton, directed them to C. G. Brenton, and in accordance with a request upon the envelope, the letters·were returned to her at Tilsonburg post-office, in the province of Ontario; that in this manner she received two letters thus returned, one from Detroit and the other from Saginaw; that Mrs. Wardle, after discovering the mistake, sent to and received from Miss A. G. Brenton, at Detroit, several letters, in which an understanding was had between them that Miss Brenton was to visit Mrs. Wardle; that Mrs. Wardle also talked freely with her daughter Lizzie and Miss Ostrander, who was staying with Mrs. Wardle's family, about these letters, and that her husband also knew of the correspondence with Miss A. G. Brenton. Referring to the statements in the alleged libelous article, counsel for plaintiff further said to the jury:

" I will show you that James E. Scripps knew they were not true; that he inquired into them, and he was told they were not true, and that he endeavored to back out of this and publish a complete retraction for the sum of $300. 'Three hundred dollars have I expended in proving the guilt of Donald Maclean, and now if you, Donald Maclean, will pay over the $300, I will take back this malodorous mud which this mud-flinging institution on Shelby street, which I have established, has thrown upon you, and not only upon you, but upon all men both fair and foul.'"

To account for the origin of the Brenton letter,—the one mentioned in the libelous article,—and to show the probability of its being a forgery, counsel for the plaintiff further stated to the jury:

" In the jealousies which are engendered by the strife for professional success, Dr. Maclean has made enemies;" he is "a man that sticketh closer than a brother, and a man who strikes hard when he does strike;.and the result has been

that while he has gathered about him a band of friends who will stand about him till the end, he has also bitter enemies —men who would rejoice in his downfall, men who would conspire to his downfall, men who would leave nothing undone to accomplish his downfall; and it may be, if this letter was received by Wardle—I don't know—it may be that this letter was the work of their hands. There was a man, and he now walks in the city of Detroit, who stated that he would drive Prof. Maclean from the University. He says: 'Damn him, I will drive him from the University. He has everything to lose, and I have nothing to lose.' He made his boasts openly. He was seen riding with the attaches of the *Evening News*. He walked about and drove about with the reporters of the *Evening News* just before this publication appeared. And when Dr. Farrand went with Prof. Maclean to see James E. Scripps, Dr. Farrand says: 'It is the work of this man,' naming him; 'it is the work of this man. He has threatened to drive Maclean out of the University repeatedly, and this is part of the scheme to that end.' James E. Scripps did not deny it, gentlemen of the jury,—James E. Scripps did not deny that this letter was published at the instigation of this man. And we shall show you, gentlemen of the jury, that when this letter appeared this man was seen walking through the streets of Detroit, with the *Evening News* in his hand, saying, 'Damn him, I have got Maclean now. I have put up this job on him, and if this will not drive him from the University I have got something that will.' Gentlemen of the jury, this scheme is in complete accord with the the whole course of the *News*. For the past few years its columns have been filled with attacks upon the professional schools of the University. Article after article appears, attack after attack, aspersions not alone upon the head of the University; and this, gentlemen, may have been,—I don't know as it is, but we shall put before you all the facts just as we have them, and leave you to judge,—I say, gentlemen of the jury, this attack may have been a part of the scheme."

For the avowed purpose of showing malice, counsel for the plaintiff stated to the jury that among other things, the plaintiff would prove that one Michael J. Dee

"purported to represent Mr. Scripps in a negotiation which a friend of Dr. Maclean undertook, unknown to Dr. Maclean. Mr. Tom S. Applegate, editor of the Adrian *Times*, looked into the matter of this letter. He is an

acquaintance of Dr. Maclean of many years' standing. He has corresponded with him from time to time, and knows his handwriting thoroughly. He looked into it in order to know about it. He looked at a photograph of the letter and became convinced that it was not in the handwriting of Dr. Maclean. He went to see Mr. Scripps, and found Mr. Dee. Mr. Dee said he represented Mr. Scripps. If Mr. Scripps denies this, and says he does not represent him, what I say goes for nothing. But Mr. Dee said: 'I represent Mr. Scripps, and I am ready to talk with you about it.' Mr. Applegate said to Mr. Dee: 'Now I have examined this letter, and it is not in the handwriting of Dr. Maclean. There is no doubt about it.'

*Defendant's Counsel.* 'Why do you state this?'

*Plaintiff's Counsel.* 'Because it shows the malice of James E. Scripps in doing what he subsequently did.' Mr. Dee, after talking with Mr. Scripps, and knowing what Mr. Applegate thought about it, having every reason to believe that this letter did not emanate from Dr. Maclean, said: 'If you will pay what expense we have been to so far, $300, we will drop the whole matter and take it all back.' I stated that to you in another connection. It has a bearing in this case in many ways, but it has a bearing upon the aspect of the case in which James E. Scripps seeks to escape the consequences of this publication under the plea of privilege. It shows that James E. Scripps knew or had reason to know, that this publication was false; and notwithstanding that, he not only put upon the records of this court a plea of justification charging Dr. Maclean with the authorship of this letter, but in addition to that he published the charge broadcast in the *Evening News.*"

All the foregoing statements made by counsel for plaintiff, in his opening to the jury, are objected to by the defendant, and are made the subject of his assignments of error numbered 63, 64 and 65. When these statements were made, it was with the avowal of plaintiff's counsel (he being interrogated upon the subject) that he proposed "to offer evidence of everything" he stated.

The testimony, as stated by counsel, if given, and believed by the jury, would prove the defendant an habitual libeler, and his paper a dispenser of slime; that in the present case he maliciously inflicted an injury upon plaintiff of the most

atrocious character, without the least justification or excuse, and so known to be by defendant at the time he did it; and that he was a blackmailer of the meanest sort, offering to retract his false and libelous statement for the sum of $300.

Counsel further made statements which, if believed by the jury, would sufficiently explain and make clear every suspicious circumstance connecting the plaintiff with the Brenton letter and Mrs. Wardle's receipt of letters addressed to that name.   The testimony proposed must be conceded to have been material; but when the evidence in the case was closed no testimony had been given to establish any of the facts thus laid before the jury in the opening of the case by plaintiff's counsel, whose reputation for ability, candor and integrity was in some measure a guaranty that the facts were as stated, and that proofs would be made of the same.

The facts alleged in the paragraphs of plaintiff's opening objected to, if they existed, were competent testimony for the plaintiff in making out his case; and the promise of his counsel that he would prove them should have been redeemed or the statements should not have been made.   It impressed upon the minds of the jury not only the facts stated, but a theory of the case which could not have been inferred from the evidence independently of those facts. They gave a coloring to very much of the evidence that. made it false, and other portions unreliable and delusive and prejudicial to the defendant to an extent beyond any known means of ascertaining by court or counsel.   They could not fail to impress the jury unfavorably towards the defendant, and they were allowed to remain as presented, without comment, throughout the trial.   Such a state of things cannot exist and a fair trial be had or justice in the case be properly administered.

The mischief complained of in the opening statements of counsel has, on several different occasions, received the attention of this Court.   In the case of *Scripps v. Reilly* 35 Mich 371, which was for libel, counsel for the plaintiff

was permitted against objection to read, in his opening statements to the jury, certain articles from the newspaper in which the libel appeared, upon his statement that it was done in good faith and that he intended to offer the same in evidence; but he failed so to do. The Court say : "if all the articles allowed to be read in the opening statement had been afterwards given in evidence, their reading in the opening, however contrary to settled practice, might not have offered anything proper for consideration here. Questions concerning their admissibility would fall under another head. But where it is manifest the trial judge has fallen into a serious mistake—one likely to have hurt a party— an error mentioned in the books as an abuse of discretion— this Court is bound to take cognizance, or disregard its constitutional duty of supervision. It is a chief duty of the trial judge to secure fair play to litigants, and so far as practicable to shape the order and course of proceedings in such a way that neither party will be put to a disadvantage not due to his case or its mode of management by his counsel." The Court in this case further say : Rule 62 of the circuit court " indicates very distinctly the extent of both right and duty. It draws a line between ' evidence ' and ' facts,' and contemplates a ' fair ' statement of the ' facts ' expected to be ' proved ' before putting in the testimony or ' evidence ' by which these ' facts ' are expected to be ' proved.' Neither the nature of the proceeding, nor that fairness it is intended to promote, nor the plain meaning of the rule, gives any sanction to the claim that in this opening statement the plaintiff's counsel may read at length to the jury any documentary matter he may assert his intention of subsequently offering as evidence."

I fully agree with Mr. Justice Graves in the case, in the following statement by him of the tenor and scope of the text-books upon this subject, and the rule as he deduces it therefrom :

" The text-books in this country which deal with the subject are distinctly agreed concerning the end and scope of this opening address. They all represent it as a proceeding

prefatory to putting in evidence, and as one practically necessary to make an advance exhibit of the legal nature of the controversy and its salient peculiarities, and enable the judge, jury and opposing counsel to apprehend the necessities of the plaintiff's case and correctly understand the drift and bearing of each step and each offer of proof as it shall occur subsequently. And considering that its office is to afford preliminary explanation, that it is to precede proofs and precede controversy before the jury, and is not to embody or convey proof or prepossess the jury, they unite in substantially denying the right to make use of it to get before the jury a detail of the testimony expected to be offered, and especially any not positively entitled to be introduced, and deny the right to use it as a cover for any topics not fairly pertinent. A brief summary or outline of the substance of the evidence intended to be offered, with requisite clear and concise explanations, are considered proper. But a relation of expected oral testimony at length, or a reading of expected documentary proofs at large, or any other course fitted to mislead the triers, should not be tolerated." * * * Green's Pr. § 443; 1 Burrill's Pr. 234; 3 Waite's Pr. 86; 1 Tiff. & Smith's N. Y. Pr. 553; Puterbaugh's Ill. Pl. & Pr. (2d ed.) 589; Bouv. Inst. 333, 334. See also 1 Archb. Pr. 191; 3 Chit. Gen. Pr. 878 et seq.; 2 Broom & Hadley's Comm. (Am. ed.) 264, 265; *Ayrault v. Chamberlain* 33 Barb. 229.

In that case some of the articles read to the jury in the opening were not offered in evidence at all, and the court says: "The omission [of the circuit judge in his charge] to tell the jury to disregard the articles not offered was no doubt an inadvertence of the court. The effect, however, was the same as if it had been designed. But if the charge had been to disregard all unadmitted articles, it would not have cured the error. Because it is quite impossible to conclude that the jurors had not been influenced too far by the erroneous rulings and proceedings to be brought into the same impartial attitude by the court's admonition, which they would have held if the counsel for defendant in error

had been properly confined in his opening statement. * * * The error in this case was not cured, and is one subject to review, and is sufficient to require a reversal."

In that case the error consisted in the prepossession by the jury of the facts read to them by counsel from a paper, of which no testimony was offered; and in the present case the prepossession of the facts was obtained by a statement to them of the same by counsel, of which no proof was offered. There is really no essential difference in the sources from which the error arises in the two cases.

The case of *Scripps v. Reilly* was again before this Court in 38 Mich. 10, and the same question was reviewed, though in a different form, and Mr. Justice Marston, in delivering the opinion of the Court, said:

"Everything having a tendency to prejudice or influence a jury in their deliberations, which is not legally admissible in evidence on the trial of the cause, should be, so far as possible, kept from coming to their knowledge during the trial. An impression once made upon the mind of a juror, no matter how, will have more or less influence upon him when he retires to deliberate upon the verdict to be given, and no matter how honest or conscientious he may be, or how carefully he may have been instructed by the court to not permit such incompetent matters to influence him, or have any bearing in the case, it will be very difficult, if not impossible, for him to separate the competent from the incompetent, or to say to what extent his impressions or convictions may be attributed to that which properly should not have been permitted to come to his knowledge. But whatever the reason for the rule may be, all courts agree in excluding incompetent testimony, and that an error in this respect will be sufficient cause for reversal. This rule would be but slight protection if counsel or witnesses could be permitted to make a statement, but not under oath, of the incompetent testimony, or counsel state the same fully to the jury in their argument, or otherwise. The essence of the wrong consists in the fact that such incompetent testimony is brought to the attention of the jury, more than in the

method adopted in communicating the fact. No matter how the information is derived, the result is the same."

The question here made was also considered by this Court in the case of *Porter v. Throop* 47 Mich. 313. In that suit the proponent was charged with improper conduct in procuring a will to be made in his favor by his mother, and the contestant, in opening his case to the jury, stated that the proponent had been guilty of the like disreputable conduct in influencing his feeble brother to make a will in his favor. Contestant was permitted to make this statement against the objection that the matter stated was irrelevant and could not be proved. Mr. Justice Cooley, in delivering the opinion in that case, said of the jury:

"How far their minds would be poisoned by the assertion it would be impossible to know; but the statement of respectable counsel that the damaging fact was susceptible of proof, would almost inevitably, in the minds of those unaccustomed to an investigation of legal facts, attach suspicion to the conduct of the party accused, and place him at a disadvantage not justified by the law. It would compel him to take up the burden of defending his actions and motives before they had been in any legal manner attacked or impugned, and while all legal presumptions were in their favor. * * * It seems almost inevitable that this course should have had some tendency to defeat the ends of justice. The case was one which, upon its facts as subsequently developed, might well be considered close and doubtful. Whichever side began the case with a prejudice in the minds of the jury against his adversary, was possessed of an advantage which might in the end prove controlling. If that advantage was obtained by putting before the jury damaging facts which could not be investigated in the case, and which for that reason it was improper for counsel to assert, it was an unfair and illegal advantage, and the court should have interposed to prevent it with promptness and efficiency."

I think these remarks apply with great force to the present case. It is true, the facts stated to the jury in that case were irrelevant,—and so were many of them in the present

case,—but, relevant or irrelevant, if no proof is made or offered of them, the injurious effect is the same; and I think even greater in the case of relevant than of irrelevant testimony. The irrelevancy of the facts may be so apparent to the jury that their statement will make no lodgment in their minds or be entirely rejected by them without any instructions from the court; while if the facts stated and not proved are relevant, this will seldom be the case.

I fully agree with the learned counsel for the plaintiff that, in a case like this, "it would be remarkable indeed if the evidence in all things bore out the opening" statements of counsel, "and all that can be required of them is that they act in good faith, with a proper sense of the obligations which must rest upon them as officers of the court." But there is also an obligation resting upon clients, in this regard, to place the facts they can prove, and the names of persons by whom they can prove them, fully and truly before their counsel. This is a duty they owe to the opposite party and to the court; and if they fail to do this, and thereby lead their counsel into the error of making statements, in their opening to the jury, of facts of which there is no proof, to form or complete a basis for some favorite theory in the case, the client should take the consequences of such a proceeding, and the opposite party should not be prejudiced or allowed to suffer therefrom. Of course, slight omissions, discrepancies or mistakes not prejudicial will not be noticed; but where there has been a wide departure from the rule in this regard, one which is likely to injure the party affected thereby, it becomes the duty of the appellate court to consider the same, and if possible relieve against such injury. And the magnitude and importance of the case only makes the duty of the appellate court more imperative. After a careful examination of the record upon this subject, I am unable to avoid the conclusion that, under the rule established for the guidance of court and counsel, and under the decisions of this Court above referred to, the alleged errors now under consideration are well assigned.

Exactly what action is necessary for the party to take who is injured by such irrelevant or unsupported statement of facts, made by counsel to the jury, in order to save his rights, is not very well settled by the practice in this State. The practice, however, should be such as will, in all cases of the kind, fully protect the injured party. The question relates to the orderly conduct of the case upon the trial, and is one peculiarly within the province of the circuit judge, and within his discretion so long as that discretion is properly exercised; and I fully agree with the previous decision of this Court, that "when it is manifest the trial judge has fallen into a serious mistake—one likely to have hurt the party—an error mentioned in the books as an abuse of discretion—this Court is bound to take cognizance, or disregard its constitutional duty of supervision." Circuit court Rule 97 provides for an issue roll for the use of the court and counsel upon the trial of a cause. By it the court is advised fully what issues are in the case, and it is the duty of the trial judge, when counsel make their opening statements to the jury, to see tó it that facts which are clearly inadmissible under the issue are not stated in the opening.

Objections of opposite counsel can do little or no good. He certainly cannot anticipate such statements will be made, and he cannot object to them until after they are made. It is then usually too late to remedy the mischief, and as to facts stated ᵔwhich are relevant and not proved, objections must necessarily be of no avail. The jury having been prepossessed with these facts all through the trial, it can hardly be expected that they would remain—and go to the jury-room—uninfluenced by the impressions made.

While it would be very proper for the court in many cases to instruct the jury to banish from their minds entirely any views they might entertain, induced by such statements, (and it is possible such instructions might sometimes have the effect of remedying the evil), still, if the verdict should be against the party prejudiced, it would be impossible to know whether the court's instructions were heeded or not.

The law never places the rights of parties in such jeopardy, and there is something wrong in any practice which allows it to be done. In this case no suggestion whatever seems to have been made to the jury by the court, or excuse offered by plaintiff's counsel in their presence, in regard to the irrelevant matters, or to the facts stated which were unsupported by any evidence. The party offending does so at his peril, and he has no occasion to complain if he finds the chances against him. I can see no occasion for any action on the part of the injured party until the verdict has been rendered. There can be no safety in requiring as a condition precedent to taking future remedial action, that the party injured shall make objection or take exceptions, or apply to the court for special instructions, when it would be impossible for him or the court to know whether or not the instructions, if given, would or could be made to remove the mischief produced by the erroneous proceedings. It is only when the verdict is against him that he has any cause to act. He may then move for a new trial at the circuit, or have resort to his writ from this Court; and this seems to have been the course pursued by the defendant in this case.

In connection with this subject the last assignment of error may be properly considered. Under it exception is taken to the remarks of plantiff's counsel in making the closing argument. Some things were stated not warranted by the testimony, and the remarks were not strictly in order, but I do not think they can be regarded as seriously prejudicial.

Seven assignments of error relate to testimony showing the health and physical condition of Mrs. Wardle, covering the period during which defendant's pleadings allege plaintiff had criminal conversation with her. The object of the testimony was to prove the untruthfulness of the charge by showing her physical infirmities such as to render it impossible or at least improbable. This testimony was competent and the several objections were properly overruled. It is claimed that the testimony giving Mrs. Wardle's

statements, showing her condition at the time they were made, was especially objectionable. The rule in this State, however, has been otherwise settled. *Hyatt v. Adams* 16 Mich. 200 ; *Johnson v. McKee* 27 Mich. 471 ; *Elliott v. Van Buren* 33 Mich. 49.

After the plaintiff had rested, the defendant, to show that Mrs. Wardle was not in the low state of health testified to on the part of the plaintiff, propounded the following questions to Miss Ostrander, one of his witnesses and a lady who lived in the Wardle family : "1st. State whether Mrs. Wardle was in the habit of driving out a good deal herself and visiting at various places. 2d. Will you state whether Mrs. Wardle was, before the time of Mr. Wardle's coming home with this letter (meaning the Brenton letter) that you speak of, in July, in the habit of remaining home most of the time; whether she did a good deal of visiting from one town to another?" These questions were both objected to by plaintiff's counsel, but no ground was stated for the objection. The objections were sustained by the court. This was error. The testimony tended to meet the case made by the plaintiff on that point, and the answers should have been allowed. (The permission granted by the court was insufficient to cover the ground ; it did not cure the error.)

On the re-examination of Mrs. Wardle, the plaintiff proved a conversation between her and her husband, in the presence of her father, which occurred on Friday night before she left, relating to the charge he made against her, and her avowal of innocence, and her intention to prove it. This was objected to. It was not proper re-examination and was irrelevant. The proof was of a character to prejudice and was erroneously admitted.

John McVicker testified, on the part of the defendant, that he was the managing editor of the *Evening News;* that he superintended and gave directions in preparing the matter for the paper ; that he had general supervision of what matter went into the paper outside of the editorial columns proper ; that the alleged libelous article was in his department, and was written by himself; that he got his

information in regard to it from publications in the Tilson-burg *Observer*, the Tilsonburg *Liberal*, the Toronto Globe, the Woodstock, Ontario, *Times*, and the Chicago *Times*—all Canada papers except the last; and after stating some other efforts made to ascertain the facts, he was asked, "Why was this article published?" Counsel for plaintiff objected to the question, but stated no grounds for the objection. The witness further stated that the defendant first saw the article on the day it was published in the *Evening News*, and that witness informed the defendant of the publicity of the scandal and the facts he had learned at that time.

James E. Scripps, the defendant, was also examined, and testified in his own behalf that he was not acquainted with the plaintiff when the article complained of was published; that he believed what McVicker told him in regard to the matter; and that he had no ill-will of any kind towards plaintiff. Defendant's counsel then asked the witness the following question: "State whether you had any purpose to injure him [the plaintiff] in assenting to the publication, or whether you did it on other grounds." Plaintiff's counsel objected, saying: "It is not proper cross-examination, and the article itself must justify the grounds, if it is privileged." The court sustained the objection to each of the foregoing questions, and exceptions were properly taken.

I think the second question was proper and the defendant should have been permitted to make his answer. It enabled him to state with what motive and faith he made the publication. The plaintiff sought to obtain exemplary damages; and to mitigate those, at least under the rule in this State, it was clearly admissible. In *Scripps v. Foster* 41 Mich. 746, which was an action for libel, Mr. Justice Marston says: "In this State, it is the settled doctrine that in an action like the present, where the plaintiff seeks to recover exemplary damages, the defendant on the trial may introduce facts and circumstances tending to show that he acted in the matter complained of in good faith, and that after using all proper precaution he had good reason to believe

that the facts as published were true." It was substantially conceded by counsel for plaintiff, in his opening, that if the Brenton letter was shown to be in the handwriting of the plaintiff, the defense would be complete. The case was close upon the facts,—sufficiently so at least to make the question of motive and good faith very important; and under the practice in this State, as settled by this Court, the defendant was not limited in making his proofs upon that subject to outside facts and circumstances, but could himself testify directly as to his good faith, and what were his motives. *Watkins v. Wallace* 19 Mich. 57; *Beebe v. Knapp* 28 Mich. 53. This, however, he was not permitted to do.

Upon another branch of the case, as it went to the jury, the testimony queried after was entirely proper. The case was tried on both sides upon the theory that the article complained of was prima facie privileged; and the court (I think correctly) so charged the jury. The University of Michigan is the most useful and important and the best known of all our public institutions. It is the pride of our commonwealth. It is the seat of science and of education in literature and art, and in all the learned professions; and is open and free to all our youth, both male and female, throughout our borders. Citizens from all parts of the Republic and adjacent provinces, in large numbers, avail themselves of its benefits. Every citizen, man, woman and child in this State is interested in its good name, fame and prosperity. Its general management and supervisory care is intrusted to a board of regents elected by the people, and its pecuniary support is derived from the public treasury. Among the departments at the institution, authorized by the Legislature, is that of medicine. Great care is required and has always been exercised in selecting pure, intelligent, learned men for the professorships in the various departments. Not only is all the learning in the medical profession taught at the University, but to aid the student and give him practical instruction in the pursuit of his studies, the professors in this department are authorized to treat all

manner of ailments and diseases, at the institution, of all persons who may apply for relief there. For more than thirty years, through the vigilance, probity and ability of its president and several faculties, it has acquired and justly so, a name and fame for usefulness, unsurpassed and perhaps I might say unequaled, by any other of the kind on this continent. That good name, fame and usefulness, every person knows, has been acquired only by the efforts and energy of professors who have borne irreproachable lives and characters in carrying forward the great works entrusted to them, and can only be maintained by such. No one can fail to discover that any gross moral delinquency or criminal conduct on the part of any member of any one of the several faculties, must necessarily injure and impair the usefulness of that department, and seriously affect its good name and fame. Dr. Maclean stood at the very head of the department of surgery, and had for several years. Mrs. Wardle was an invalid from the province of Ontario, visiting the institution for treatment, and for some time occupied one of the public hospitals. It was charged by her husband and believed by her family, and reported through several papers in the province where she lived, that the plaintiff had taken advantage of his profession and the position he occupied, to seduce Mrs. Wardle, and held criminal conversation with her; and that the evidence of his guilt was in letters of his own writing in possession of her husband; and was so strong that Mr. Wardle had discarded his wife and was so shocked by the disclosure that he had lost his reason and become violently insane. If the charge was true, the defendant, as editor and publisher of a paper with 35,000 or 40,000 subscribers, had not only the right, but faithful journalism made it his duty, to publish these facts; to "cry aloud and spare not." His paper would have been unworthy the support of any people making any claim to morality, had he failed so to do. The charge was severe, though if true, the language was not unjust; neither was it more than might reasonably be expected from "honest indignation" in such a case. Some allowance must be made for

that. The charge concerned a public man in a high public position, in charge of most important public interests; those in which all the people were interested. He was a public servant, paid from the public funds; and the article concerns his conduct while in that service, which was a proper subject for public discussion and criticism, and I think the article was privileged within the law as expounded by this Court. Certainly it must be so if charges of alleged fraud against a member of a board of trade is within the protection, as held by my brother Cooley in *Atkinson v. Detroit Free Press* 46 Mich. 341; in which opinion upon this subject I fully concur. If then, the publication was privileged, whether true or not, (unless the privilege was abused,) it was a perfect defense; but if through malice, carelessness or neglect it was lost, (as it might be), the defendant was liable. The plaintiff assumed that defendant abused and lost his privilege. In such event the good faith of the defendant was competent testimony to mitigate damages, and his motives and object proper upon the subject of malice. For that reason he should have been permitted to make his answer to the question objected to, and whatever other showing he had upon that subject. *Farr v. Rasco* 9 Mich. 353; *Huson v. Dale* 19 Mich. 17; *Foster v. Scripps* 39 Mich. 376 and 383; *Scripps v. Foster* 41 Mich. 742; *Miner v. Detroit Post and Tribune* 49 Mich. 358; *Atkinson v. Detroit Free Press* 46 Mich. 376; *Barrows v. Bell* 7 Gray 301; Addison on Torts 931; Cooley on Torts 218, 210, 211; Odgers on Libel and Slander 4, 182, 264, 265; *McBee v. Fulton* 47 Md. 403.

McVicker was one of the editors; in fact, had principal charge of matters concerning this State, and knew the reasons for giving every article in his charge to the public. He it was who wrote the article, and he and the defendant authorized its publication. He consulted with the defendant about publishing it, and knew just what motives prompted not only the writing of the article, but its publication. His individual reasons and motives, unknown to and unconnected with those of defendant, were unimport-

ant; but so far as they might have been or were approved by the defendant, they became the defendant's, and were competent, and I think, should have been given to the jury. The rejection of this testimony was also error.

The deposition and testimony offered to show the handwriting of the Brenton letter to be plaintiff's, by using photographic copies of writings conceded to be his, was inadmissible and was properly rejected. No necessity was shown for a resort to secondary evidence; and, at least until such exigency is shown to exist, the reasons given by Chief Justice Folger in *Hynes v. McDermott* 82 N. Y. 50, are sufficient for its exclusion. He says: "We may recognize that the photographic process is ruled by general laws that are uniform in their operation, and that almost without exception a likeness is brought forth of the object set before the camera. Still, somewhat for exact likeness will depend upon the adjustment of the machinery, upon the atmospheric conditions, and the skill of the manipulator. And in so delicate a matter as the reaching of judicial results by the comparison of writings through the testimony of experts, it ought to be required that the witness should exercise his acumen upon the thing itself which is to be the basis of his judgment." The objection was not one of form only, but related to matter of substance, and was timely taken.

All the other assignments of error relating to rulings on the admissibility of testimony, I have examined with care, and have not discovered any error therein which can be regarded as prejudicial to the rights of the defendant. The record shows that the learned judge before whom the case was tried used his best endeavors, amid all its complications, to exercise a fair and reasonable discretion in all his rulings upon the trial, and in such case this Court will not disturb them for immaterial fault or error that could not harm the complaining party. *Somerville v. Richards* 37 Mich. 299; *McKeown v. Harvey* 40 Mich. 228; *Shipman v. Seymour*, id. 274; *Fraser v. Jennison* 42 Mich. 206.

The plaintiff's first and second requests should have been

given. They were warranted by the testimony. They were not given in substance in the charge, and particularly the second. The court substantially told the jury that, under "proper restrictions, in a proper and decent manner, and in a right spirit," the press of the country had a right to comment on ·the libelous article from the Canada papers, "call attention to it," and "demand investigation." These restrictions were too indefinite. They attached conditions to privileged communications, unknown to the law, most difficult to prove, and, as regards what constituted them but few men would agree. The difference between the charge and request is very material. Had the request been granted the jury would have understood that when the ·interest of the University was involved, the occasion was a privileged one, and that it was proper to ·let the people understand what was being said about it, with such comments as the occasion might call for. The instruction asked was plain and simple. The charge, as given, attached important conditions, upon which any jury might find much difficulty.

Counsel for plaintiff asked the court to give his third request as follows : "That the article sued upon is prima facie privileged, and, whether true or false, no recovery can be had upon it unless the jury are satisfied that it was published through malice towards plaintiff." This request was properly refused. The article was prima facie privileged, and the authorities all agree that the defendant could not loose his protection without he had been guilty of actual or legal malice. Actual malice, or as it is frequently termed, express malice or malice in fact, is always *towards* the plaintiff, and intended, and is that feeling of the human heart which prompts the desire to do another harm or injury ; and of all the passions it is the most wicked. This is the kind of malice referred to in the plaintiff's request just given. And when a privileged communication is published with this feeling as its controlling motive, the pub lisher loses his protection.

There is also another way, as I have already said, in which he may lose his privilege, and without entertaining

any actual malice, or even ill-will towards the injured party. He may do so if he publishes as true what he knows to be false, of another, or if he publishes libelous matter without believing it true or having probable cause to believe it true, or if he suffers the publication to be made carelessly or negligently without knowing or having probable cause to believe its truth. Either of these cases would constitute what is termed in the books Malice in Law; and, like malice in fact, will cause the publisher to lose his privilege.

It is left for the trial judge to admit the testimony tending to prove the existence of either kind of malice, when it is alleged, and which will necessarily vary according to the circumstances of each particular case. A libel, though privileged, may itself contain evidence tending to show actual malice, as for instance, when the language used in the libel is so violent, intemperate and vindictive, as to clearly overshadow a plain statement of the facts or matter claimed to be proper to be given to the public. I quite agree with Mr. Justice Cooley, " that the case must be very clear to justify the court in a conclusion of malice before the extrinsic facts are shown," and I will say further that whether the libelous article contains such intrinsic evidence as tends to show actual malice, is a question always to be determined (however difficult it may be) by the court, and if it does not, it should not be allowed to go to the jury upon that point. The request ignores the existence of any testimony in the case of legal malice, and was therefore wrong, and the plaintiff's fourth request has the same infirmity.

There was no error in refusing to give the plaintiff's fifth, ninth and eleventh requests. They contained no questions of law, and the views of the court were not required on the questions of fact.

The sixth, eighth, tenth, thirteenth and fourteenth requests were all substantially given in the charge of the court.

There was testimony in the case tending to prove legal malice, and therefore the plaintiff's twelfth request was properly refused.

The plaintiff's counsel, in their seventh request, asked the court to charge the jury that they could not infer malice from the evidence that the article was untrue, but it must be shown, in addition, that the defendant knew it was untrue before such inference can be made. The request states the law correctly. Odgers, 267, 274; Townshend on Slander and Libel 599. And upon the claims made by plaintiff's counsel, the request was a very proper one for the jury, and should have been given as requested. Its substance does not appear in the charge. The refusal of the court to allow the jury to take the exhibits in the case with them to the jury room, was within his discretion; and his action in this matter cannot be reviewed in this Court. ·

No handwriting of the plaintiff was introduced in evidence which any of the witnesses saw made, so that in ascertaining whether the Brenton letter was in the genuine writing of the plaintiff the important testimony on both sides came from comparing it with what was conceded on the trial to be Dr. Maclean's handwriting. Witnesses on the part of the plaintiff testified they had seen him write, and knew his writing, and after comparing the Brenton letter with the genuine, pronounced it not the plaintiff's. There were eleven witnesses, besides the plaintiff's wife, who were sworn for the plaintiff on the subject of handwriting, none of whom were experts. On the part of the defendant five were sworn,—all experts of unquestioned ability,—who pronounced it genuine. It is not easy to see what advantage one set of witnesses had over the other, except as the one had seen the doctor's movement of the hand as he carried it over the paper on several different occasions in making the writing, and were able to carry that operation in their minds. In any event, if the testimony of experts can ever be satisfactory and rise to the dignity of good and convincing evidence, it is upon the subject of determining the genuineness of handwriting under the circumstances as they existed in this case.

The instance suggested by counsel for one of the parties in this case very happily and with much truthfulness shows

the relative circumstances under which the testimony of handwriting in a case like this must be considered and weighed by the jury. " Three witnesses are called to prove the handwriting of A. The first has seen him write five times; the second has received five letters from him in as many years, and has none of them before him; the third has five admitted letters before him to compare with the disputed one. It is evident the first witness must give his opinion upon a comparison with the writing he saw A. do. The second must rely upon his comparison with the letters he received. It is entirely clear that, added to the uncertainties of the testimony given by the third witness, are the uncertainties of memory in the cases of the first and second. It would be marvelous indeed if the memory of the first and second witnesses gave them an absolutely correct idea of his handwriting. The third witness has an absolutely accurate standard for comparison." It would seem that the value of the third man's opinion ought to be as good as that of either of the others.

The judge charged the jury, as the law established by this Court, that expert testimony " is not of the highest quality, and only the necessities of the case have permitted it to be introduced at all in the administration of justice; testimony which is not considered one way or the other of the highest order, yet testimony to be considered honestly by the jury; to be given such weight as it seems intrinsically to have, as delivered by the witnesses upon the stand." While this may be true in some cases, I think it an improper charge to give in this class of cases; and I very seriously doubt its usefulness in any case. It tended to deprive the defendant's testimony of its proper consideration and weight by the jury, and it should not have been given. It usurped to a certain extent the province of the jury.

It is unnecessary to discuss further the questions raised under the fifty-third and fifty-fourth assignments of error.

The remaining errors assigned upon the charge relate to the instructions given to the jury as to how they should answer the special questions submitted to them at the re-

quest of counsel. These instructions were improperly given. They informed the jury under certain circumstances what answers to make to the several questions submitted. I have already had occasion to submit my views to some extent on the questions raised by this exception in *People v. Murray*, post p. 289.

The object of the statute (Comp. L. § 6026; How. St. § 7606) requiring the jury to answer specifically questions giving their conclusions on the facts necessary to be found to entitle a party to recover, was to ascertain whether or not they had found sufficient facts from the evidence to support their general verdict under the law as given them by the court. It is the province of the jury to find these facts from the evidence, without aid or suggestion from the court, and this can never be done if the jury are told in advance what facts are necessary to be found to support the verdict, or what answers to the questions propounded will be consistent therewith, or what they must find in order to answer a question propounded in the negative or affirmative. This practice will make the general verdict control the findings, instead of the findings control the general verdict; and thereby the object of the framers of the statute will be defeated. This was the result of the practice indulged in this case. The effect is to make the court, and not the jury, decide the main issues in the case. *Cole v. Boyd* 47 Mich. 98. The special findings of the jury were sufficient to support the general verdict had the proceedings upon which they were based not been erroneous.

Several minor questions remain unnoticed; but the length this opinion has already reached forbids further discussion; and it can only be excused in view of the important questions involved and the great interests at stake.

Entertaining the views herein expressed, I think the judgment of the Superior Court should be reversed, and a new trial granted.

———

Afterwards, at the January term 1884, when Chief Justice Graves had retired from the bench and been succeeded

by Mr. Justice Champlin, a motion for a rehearing was made upon grounds which are noticed in the following opinion. Submitted January 15, 1884. Denied January 22.

*John Atkinson* for the motion. Relationship to counsel disqualifies a judge: *Hasceig v. Tripp* 20 Mich. 216; *Stockwell v. White Lake* 22 Mich. 341; *Peninsular Railway Co. v. Howard* 20 Mich. 18 citing *Queen v. Justices of Hertfordshire* 6 Q. B. 753 ; *Queen v. Justices of Suffolk* 18 Q. B. 416 ; *Queen v. Justices of London* id. 421, and Cooley's Const. Lim. 410 ; *Mich. Air Line Railway v. Barnes* 40 Mich. 383 ; *Oakley v. Aspinwall* 3 Comst. 547 ; *Newcome v. Light* 58 Tex. 141: 44 Amer. 604; *Hibbard v. Odell* 16 Wis. 633; *Call v. Pike* 66 Me. 350 ; *Hall v. Thayer* 105 Mass. 219 ; *Taylor v. County Commissioners* id. 225 ; *People v. Cline* 44 Mich. 290 ; *Bullard v. Trice* 63 Ga. 165 ; *Hardy v. Sprowle* 32 Me. 310 ; *Bates v. Thompson* 2 Chip. 96 ; *Foot v. Morgan* 1 Hill 654 ; for the attorney has a lien on the judgment: *Reed v. Coots* 43 Mich. 321 ; *Wells v. Elsam* 40 Mich. 218 citing *Rooney v. Second Avenue Railroad Co.* 18 N. Y. 368 ; *Dowling v. Eggemann* 47 Mich. 171; *Dennis v. Kent Circuit Judge* 42 Mich. 249 ; *Pipher v. Lodge* 16 S. & R. 214; *Melson v. Dickson* 63 Ga. 683 ; *Funk v. Ely* 45 Penn. St. 444 ; such a state of facts would disqualify a juror: *Quinebaug Bank v. Leavens* 20 Conn. 87 ; *Jaques v. Commonwealth* 10 Grat. 690 ; *Georgia Railroad Co. v. Hart* 60 Ga. 550.

*Levi T. Griffin* and *Otto Kirchner* against.

COOLEY, C. J. Motion is made for a rehearing in this case upon grounds which will be noticed briefly.

I. It is said that to meet the testimony that the letter the plaintiff was charged with having written was his, "he or his friends prepared a number of witnesses to testify in his behalf by furnishing them with what purported to be specimens of his handwriting. From these specimens, which they refused to produce, the witnesses thus prepared, testified that they knew his handwriting, and that the letter was not

his. The defendant's counsel, on the hearing, urged the impropriety of this practice, and insisted that it was ground for reversal." And it is complained that in neither of the opinions was the point noticed.

This Court reviews the rulings of the trial courts so far as they have been specifically objected to. Questions of propriety in the conduct of parties, which have not been brought to the notice of the court below and ruled upon, are not in this Court grounds for a reversal. If any witness in the trial court testified to the plaintiff's handwriting without being shown to have knowledge of it, it must be assumed that the trial court on motion would have struck out his evidence. If it was shown that he knew the handwriting, the evidence must stand for what it was worth. But if counsel could convince the jury that the witnesses had been "prepared," as he claims was the case, it is not likely their evidence would have received much attention.

II. It is complained that the Court took no notice of the exception taken to the evidence of an expert, who testified that a letter like the one in dispute could be built up from specimens in the hands of a skillful writer. The question which called for the evidence, it is said, was a hypothetical question, and as there had been no evidence that any one had specimens of the plaintiff's handwriting, there was no foundation laid for asking it. The Court did not consider the objection well grounded in fact, and do not now. There was considerable evidence by witnesses who had seen and possessed specimens of the plaintiff's handwriting, and his profession and public position would render it probable that many other persons must have had them. No member of the Court had any doubt of the question being allowable, and the ruling complained of was passed by without notice as being so obviously correct as to call for no special mention.

III. Two requests for instructions by the defendant, which are said to involve "all that is valuable in the privileges of the press," were not specifically given, namely: *First*, whether in cases where the publication was priv-

ileged, and where it is conceded the plaintiff must prove falsehood and malice, malice may be inferred from falsehood in the absence of any evidence that the defendant knew the publication to be false ; *second*, whether there was any evidence in the case to prove malice. Whether the trial court was right or wrong in not giving these instructions has not, it is said, been decided by this Court.

No court has gone further than has this in upholding the privileges of the press, and very few so far. If there has, by oversight or otherwise, been any failure to recognize and support them in this case, the Court would be prompt to make the correction on its attention being called to the need for it. But there has been no such failure. It is true, there was no evidence in the case of a malicious purpose on the part of the defendant to injure the plaintiff, but there were proofs from which the jury might infer that the publication was made in entire disregard of the plaintiff's rights, and from interested motives. The jury drew this inference, and returned a special finding that the publication was made, not from any motive upon which the defendant was privileged to act, but for " sensation and increase of circulation." A false and injurious publication made in a public journal for sensation and increase of circulation is unquestionably in a legal sense malicious. The finding therefore rendered the question whether malice in any other sense might be inferred from the falsity of the publication entirely immaterial. Neither in morals nor in law is the mercenary publication more defensible than if the purpose were to defame and injure. But in respect to the proof of malice the charge of the trial judge could scarcely have been made more favorable to the defendant than it was. He told the jury over and over again that, the article being privileged, the plaintiff must show " that the accusation contained in the article is untrue;" that he must " convince them by a preponderance of testimony ;" that it must be " the kind of testimony which the plaintiff is called upon to produce to the satisfaction of the jury;" that " the article is privileged; it is for the plaintiff to remove the privilege, not only by

showing that the article was untrue, but by proving that it was meant to injure;" that if "the plaintiff has failed to prove the untruth of the article, and the maliciousness with which it was published, then, the article being privileged, there would have to be a verdict for the defendant." The jury could not have failed to understand from the charge that the plaintiff was not at liberty to stop with proof of falsity, but that he must give further proof before the jury could be asked to infer malice. The trial judge appears to have been particularly careful and anxious to see that the defendant's privilege, if he had kept within it, should be preserved to him.

IV. A number of special questions were submitted to the jury, and the judge in submitting them said: " Your answers to these questions must agree with your general verdict. If you should find a verdict for the plaintiff and your answer was really for the opposite party, your answers to the questions will overrule the general verdict, so that you must be careful and try to answer those questions intelligently, and have no conflict between your general and your special findings." This instruction is said to be erroneous because it leaves the jury to find a general verdict, and then requires them to make their answers to the special questions conform to it; whereas their duty is first to answer the questions, and then give such general verdict as the answer would require. It is quite probable that the trial judge was a little careless in the use of language in this part of his charge, but if counsel considered it liable to mislead, it is to be supposed they would have called attention to it at the time that the judge might make proper correction before the jury retired. That was not done, and the time for making complaint was suffered to go by. Further than this we deem it important only to refer to *People v. Murray,* post, p. 289 decided at the last term of this Court, where a similar objection was considered and overruled.

V. The point is now made that one of the members of this Court, who was also one of the majority in deciding the case, ought not to have participated in the decision, for

the reason that his son is a member of the partnership of attorneys who were attorneys of record for the plaintiff in bringing the suit. In support of the position, a number of cases are cited in which it has been decided that a judge cannot sit in a cause in which he has a personal interest, or where he is nearly related to one of the parties. They have no relevancy to the point made, and the point itself presents no question of law. How little there is to it in fact, will be apparent when it is stated that neither the son nor his partner ever took any part in the proceedings in this Court, or ever appeared before us in the case, and that the record in this Court upon which the case was decided showed very conclusively that the management of the case in the trial court had been in other hands.

VI. The majority opinion in this case was drawn up at the request and under the assignment of the then Chief Justice, after full and careful examination by him of the record, and under an undoubting conviction that the rulings of the trial judge had been eminently fair to the defendant, and in entire accord with the previous decisions which this Court had made in protection of the just liberties of the press. The opinion was restricted to a succinct statement of the conclusions of the Court on such legal questions pre- sented as seemed either novel or disputable, and did not at all digress from them. The record showed that the twelve neighbors of these parties to whom they submitted their controversy and the vindication of their conduct respect- ively, had begun their investigation of the facts with all presumptions favoring the defendant, and continuing it on this understanding throughout, had closed it with the ver- dict that the publication complained of was without legal excuse. The judgment which followed was the judgment of the law, resulting from necessity from the facts thus con- clusively determined.

The motion for a reargument of the case will be denied.

SHERWOOD, J. Motion for rehearing in this case is based upon two grounds:

*First.* That all the points raised by appellant in the case were not passed upon by the members of the Court. This is a mistake; full consultation was had upon all the points made, and patient, careful consideration given to each by every member of the Court.

But to be more specific: under the first ground relied upon by counsel for the motion, it is claimed: 1st. Witnesses who had recently seen the handwriting of plaintiff made were permitted to testify that the Brenton letter was not in the handwriting of the plaintiff, against the objection of defendant's counsel, and that the question thus raised is not passed upon in either opinion filed. All these witnesses testified that they were well acquainted with the handwriting of the plaintiff from knowledge derived from other sources. This made their testimony competent; its weight was for the jury, and the testimony could not be excluded. 2d. An expert was permitted to give his opinion on the part of the plaintiff that a letter might be built up by a skillful penman closely resembling the handwriting of the plaintiff, and this was thought to be incompetent on the ground that it presupposed a hypothesis not in the case. The testimony was not of a character likely to injure, but the defendant's witness, Ames, had testified substantially that he did not think it possible for a person to produce the Brenton letter, resembling so closely the Wardle letter, and the plaintiff's testimony did no more than rebut this, and I think was proper. 3d. The third point under the first ground relates to the vital questions in the case, which were the subject of much discussion among the members of the court; and I have nothing to add to the opinion I have already filed in the case upon those subjects. 4th. The practice of submitting specific questions with the judge's charge, to be answered by the jury, and the duty of the trial judge in submitting the same, has several times been before the Court. There is a difference of opinion among its members upon this question. I have heretofore given my views upon the subject as applied to this case, and do not desire to add anything further.

While it must be regarded as the imperative duty of the Court to consider and pass upon any point properly raised and presented for discussion by counsel in every case, I do not think it useful, necessary or desirable that every question raised should be discussed in the opinion. The amount of business required to be done by the Court and the interest of litigants forbid such a practice.

The second ground relied upon by defendant's counsel raises no question of law, and need not be considered.

The motion should be denied.

CHAMPLIN, J. Inasmuch as I was not a member of this Court when this cause was heard, I had intended to take no part in the determination of this motion; but the retirement of one of the judges, and the refusal of another to sit or take part in the decision, seems to render it necessary for me to examine the case and form an opinion of its merits.

Accordingly, I have considered the brief and argument submitted by the counsel for the defendant, and upon investigation of the record and consultation with my brethren, I am satisfied that all errors alleged to have been committed by the trial court, prejudicial to the defendant, were fully considered and passed upon by them, and I therefore concur with my brothers Cooley and Sherwood in the conclusion reached that the motion for rehearing should be denied.

Mr. Justice CAMPBELL did not sit on the hearing of this motion, or participate in its decision.