THE CHARLES PARKER COMPANY *v.* THE SILVER CITY CRYSTAL COMPANY ET AL.

BALDWIN, O'SULLIVAN, WYNNE, DALY and PHILLIPS, Js.

Argued June 15—decided July 26, 1955

*Denis T. O'Brien, Jr.,* with whom were *Denis T. O'Brien, 3d,* and *Richard C. Harpham,* for the plaintiff.

*Fleming James, Jr.,* with whom were *David H. Jacobs* and, on the brief, *William A. Jacobs,* for the defendants.

BALDWIN, J. The plaintiff, The Charles Parker Company, brought this action against the defendants, The Silver City Crystal Company and Joseph N. DePaola, claiming damages for defamation. The trial court has reserved the cause upon stipulated facts for the advice of this court. The questions propounded which we deem it necessary to answer are contained in a footnote.[1]

The stipulated facts are as follows: The plaintiff is a Connecticut corporation engaged in the

---

[1] "(1) Whether the statement (complained of as defamatory in this case, made under the circumstances disclosed in the stipulation) set forth in paragraph No. 4 of the stipulation, is to be tested by the law of slander or the law of libel.

. . . . .

"(3) If the law of libel is applicable: (a) whether said statement is actionable without special damage . . . .

"(4) Whether the circumstances of this case disclose an occasion of privilege: (a) on the part of the defendant, Joseph N. DePaola; (b) on the part of the defendant, Silver City Crystal Company . . . ."

manufacturing business in Meriden. The defendant Silver City Crystal Company, hereinafter referred to as the defendant company, is a Connecticut corporation and owns and operates, under a license issued by the federal communications commission, radio station WMMW in Meriden. Its station has a frequency sufficiently strong to make its signals heard throughout Connecticut and in some of the surrounding states. The defendant Joseph N. DePaola was, on November 29, 1949, the legally qualified candidate on the Democratic ticket for the office of mayor of Meriden in an election to be held on the first Tuesday after the first Monday of December, 1949. On November 29, 1949, DePaola broadcast from the radio station of the defendant company a political speech in which he said, concerning the plaintiff: "This famous firm is now ninety per cent out of production and is up for sale. How many jobs will disappear? The staggering total of one thousand." On November 30, 1949, the plaintiff gave written notice to the defendant company that the statement made by DePaola was false and demanded a retraction, which the defendant company, in writing, refused to make. The plaintiff's demand was published in the Meriden papers and came to the attention of DePaola. In a political broadcast on the evening of November 30, 1949, from the radio station of the defendant company, DePaola, referring to his statement of the previous day, stated: "I stand by what I said in yesterday's radio broadcast." The statements made by DePaola were read from prepared manuscripts which had been submitted to the defendant company at least twenty-four hours before each broadcast. Since the institution of this action, the plaintiff has unsuccessfully demanded, in writing, a retraction from DePaola.

The statements broadcast by DePaola from the radio station of the defendant company, the plaintiff's demand upon the defendant company for a retraction, and its refusal were published in the Meriden morning and evening papers, which, at that time, had a combined circulation of more than 20,000.

On the days when the alleged defamation was made, the plaintiff employed upward of 326 persons, many of whom were disturbed about the possibility of becoming unemployed. The statements made by DePaola from the radio station of the defendant company came to the attention of bankers, suppliers and customers with whom the plaintiff was doing business, as well as of Dun and Bradstreet, a credit rating firm with a Connecticut office in Hartford. Although the plaintiff was subjected to expense in instituting and prosecuting this litigation, it incurred no special damages except as appears in the pleadings and stipulation. In an amendment to the complaint the plaintiff alleged as special damage that the language used would reasonably convey the impression that the plaintiff, because of lack of managerial skill or business integrity, had suffered a 90 per cent reduction in its volume of business, would be unable to continue in business and was up for sale and that 1000 employees had lost or would lose their jobs; that the language used tended to lower the plaintiff's trade reputation, thereby adversely affecting its business gains, alienating its customers, endangering its labor relations and depressing its credit, all to its harm in its business operations. DePaola, in making the alleged defamatory broadcasts, believed and relied upon statements made to him by members of a political advisory committee, consisting of four lawyers and two

accountants, and others, among whom was the treasurer of a small loan company, who, in turn, had relied upon a news item published in a trade journal.

In the course of the mayoralty campaign, both Republican and Democratic town committees bought radio time for political speeches over the facilities of the defendant company. No officer or employee of the plaintiff was a candidate for public office or made any speeches or public appearances in behalf of any candidate during the campaign. When the alleged defamatory broadcasts were made, § 315 of the federal Communications Act of 1934 was in full force and effect as follows: "If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, and the [Federal Communications] Commission shall make rules and regulations to carry this provision into effect: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate." 48 Stat. 1088, 47 U.S.C. § 315 (1946). The defendants were not motivated by any feeling of animosity or ill will toward the plaintiff or any of its people. They made no attempt to investigate the verity of the statements made. At the time of the broadcast, the plaintiff was not 90 per cent out of production and was not up for sale, and 1000 employees did not subsequently lose their jobs.

The first question is whether the acts complained of are to be tested by the law of libel or the law of slander. The statements complained of were read by DePaola from a prepared manuscript and were

broadcast by the facilities of the defendant company. If the statements were defamatory, the acts in question constitute libel. *Sorensen* v. *Wood,* 123 Neb. 348, 355, 243 N.W. 82, 82 A.L.R. 1098 and note, 1106, 1109; *Hartmann* v. *Winchell,* 296 N.Y. 296, 300, 73 N.E.2d 30, 171 A.L.R. 759 and note, 765, 780; Restatement, 3 Torts § 568, comment f; Salmond, Torts (10th Ed.) § 98. The case of *Meldrum* v. *Australian Broadcasting Co.,* [1932] V.L.R. 425, 432, decided by the Supreme Court of Victoria, Australia, holding that such a broadcast constitutes slander, appears to represent only a minority viewpoint. A distinction between defamatory words spoken and defamatory words printed and published has prevailed for many years. We have been urged to disregard it as an anachronism. The reasons for it appeal to us as still valid. "Many things that are defamatory may be said with impunity through the medium of speech. Not so, however, when speech is caught upon the wing and transmuted into print. What gives the sting to the writing is its permanence of form. The spoken word dissolves, but the written one abides and 'perpetuates the scandal.'" *Ostrowe* v. *Lee,* 256 N.Y. 36, 39, 175 N.E. 505. There is a specific criminal statute against publishing a libel but not against uttering a slander. General Statutes § 8518; see Salmond, Torts (10th Ed.) p. 871; 33 Am. Jur. 42, § 6. If one deliberately commits defamatory words to writing or printing and then publishes them by reading them aloud or by circulating copies, as in a newspaper, to others, the offense is much more serious and the result much more permanent than if the words were simply spoken.

Reading a defamatory letter in the presence of others has been held to be libel. *Snyder* v. *Andrews,*

6 Barb. (N.Y.) 43, 46; *Forrester* v. *Tyrrell,* 9 T. L.R. 257, 57 J.P. 532 (C.A.), cited with approval in *Hartmann* v. *Winchell,* supra, 299. The basis of the distinction between libel and slander is the written or printed word or passage. Having been reduced to permanent form and published, the written or printed word has greater capabilities of harm. We can see no difference between the reading of defamatory words from a prepared manuscript to a group of people within the presence of the reader, which constitutes libel, and reading defamatory words from a prepared manuscript to be broadcast by the facilities of a radio station. The latter simply carries the defamatory words farther because the defamer has used a medium for dissemination which reaches listeners far beyond the ordinary limits of the human voice. The law of libel is applicable to the case at bar.

Question 3 asks whether the alleged defamatory statement is actionable without proof of special damage: in short, was it libelous per se? When a libel is expressed in clear and unambiguous terms, the question whether it is libelous per se is one of law for the court. *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557, 565, 72 A.2d 820; *Flanagan* v. *McLane,* 87 Conn. 220, 222, 87 A. 727, 88 A. 96. Likewise, if the alleged defamatory words could not reasonably be considered defamatory in any sense, the matter becomes an issue of law for the court. *Burns* v. *Telegram Publishing Co.,* 89 Conn. 549, 552, 94 A. 917; *Donaghue* v. *Gaffy,* 54 Conn. 257, 266, 7 A. 552. Libel is actionable per se if it charges "improper conduct or lack of skill or integrity in one's profession or business and is of such a nature that it is calculated to cause injury to one in his profession or business." *Proto* v. *Bridgeport Herald*

*Corporation,* supra, 566; *Corsello* v. *Emerson Bros., Inc.,* 106 Conn. 127, 130, 137 A. 390; *Wynne* v. *Parsons,* 57 Conn. 73, 75, 17 A. 362. The plaintiff claims that the statement made by DePaola disparages the plaintiff in its business by intimating a lack of the managerial skill necessary for maintaining its business on a profitable basis, thus imputing incompetence. The statement was part of a speech made over the radio facilities of the defendant company in a political campaign. The entire context of this speech is before us as an exhibit by stipulation of the parties. DePaola introduced at the outset of his address the subject of threatened loss of employment due to the removal of manufacturing companies from Meriden. He ascribed the cause of this removal to the record of neglect and indifference of the incumbent Republican mayor. DePaola recited the names of companies which had removed all or some of their operations from Meriden, and then proceeded: "My friends in Meriden, you know The Charles Parker Company—formerly the Bradley and Hubbard Manufacturing Company. This old, famous firm is now 90 per cent out of production and is up for sale. How many jobs will disappear? The staggering total of 1,000." Placed in its context, the statement complained of does not on its face impute any lack of managerial skill or business acumen to the plaintiff company as the cause of its alleged difficulties. Rather, it places the blame for them upon the indifference and neglect of the Republican administration. The statement made was not libelous per se and would not support an action for libel without proof of special damage.

The cases of *Reporters' Assn.* v. *Sun Printing & Publishing Assn.,* 186 N.Y. 437, 443, 79 N.E. 710, and *Edwards X-Ray Co.* v. *Ritter Dental Mfg. Co.,*

124 Misc. 898, 899, 210 N.Y.S. 299, relied upon by the plaintiff, do not sustain its position. In the former case, the decision of the court turned upon the question whether the allegation concerning special damage was adequate. The latter was an action by the plaintiff against a competitor in its business to secure damages for statements which, coming from a competitor, were obviously calculated to injure the plaintiff's business.

Having concluded that the statement which was made and the circumstances surrounding its making are to be examined in the light of the law concerning libel and that the statement was not libelous per se, we come to the decisive question in the case. Are the defendants shielded from liability on the ground of privilege? The defendant company in its answer alleges that the "utterance constituted fair and reasonable comment in bringing to the attention of the voters of said City of Meriden the economic and financial status of the municipality and as such, said statements referred to were privileged." The alleged defamatory statement, as previously outlined, was contained in a speech broadcast from a radio station in an election campaign by a candidate for office. It has been stipulated that neither of the defendants was moved by personal animosity or ill will towards the plaintiff. That is equivalent to saying that they both acted without malice. It is fair to presume, unless the contrary be shown, that a candidate for elective office and a radio station which broadcasts his political appeal are acting in good faith, the one to show why he should be chosen to better serve the public welfare, the other to make available its facilities to the respective candidates so that the electorate may be informed concerning their purposes and qualifications. Any political campaign is a

process of debate and appeal publicly conducted in a way to bring knowledge to the voters to assist them in making a choice on election day. It is a time-honored American institution indispensable to our way of life. Courts must be careful not to permit the law of libel and slander to encroach unwarrantably upon the field of free public debate. *Sweeney* v. *Patterson,* 128 F.2d 457, 458.[2]

There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused. Whether the occasion is one of privilege is a question of law. *Atwater* v. *Morning News Co.,* 67 Conn. 504, 513, 34 A. 865; *Hassett* v. *Carroll,* 85 Conn. 23, 36, 81 A. 1013; Newell, Slander & Libel (4th Ed.) § 345. Speechmaking and the broadcasting of speeches in an election campaign are, on general principles, occasions of qualified privilege. See Harper, Torts, p. 536; Prosser, Torts, p. 839; 33 Am. Jur. 155 § 161, 157 § 163; 53 C.J.S. 211, § 131. The query in this case is whether the privilege was abused. The answer depends upon whether there was malice in fact or a lack of good faith in uttering and broadcasting the alleged defamatory matter. *Ely* v. *Mason,* 97 Conn. 38, 42, 115 A. 479; *Atwater* v. *Morning News Co.,* supra, 516; *Bailey* v. *Charleston Mail Assn.,* 126 W. Va. 292, 304, 27 S.E.2d 837, 150 A.L.R. 348 and note, 358, 362; *Jackson* v. *Pittsburgh Times,* 152 Pa. 406, 416, 25 A. 613; note, 110 A.L.R. 412; 33 Am. Jur. 163, § 169.

The plaintiff concedes by its stipulation that there was no animosity or ill will involved, and hence no malice in fact. It argues, however, that

---

[2] The constitution of Connecticut provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Conn. Const. Art. I § 5.

even if made in good faith, misstatements of fact are not the "fair comment" which an occasion of privilege allows. See Harper, Torts, § 251; 53 C.J.S. 211, § 130. There is authority to support this proposition. Harper, Torts, p. 536; Prosser, Torts, p. 839. On the other hand, some courts have held, upon what appeals to us as sound reasons, that privilege extends to misstatements of fact if made in good faith, without malice and under the honest belief that they are true. *Coleman* v. *MacLennan,* 78 Kan. 711, 726, 98 P. 281; *Sweeney* v. *Patterson,* 128 F.2d 457, 458; *Bailey* v. *Charleston Mail Assn.,* supra; Boyer, "Fair Comment," 15 Ohio St. L. J. 280, 301; Harper, Torts, pp. 536-537; Prosser, Torts, p. 840; note, 110 A.L.R. 412. The facts stated, however, must bear a reasonable and proper relation to the issue under discussion. If an individual is involved, they must concern his official conduct or fitness for office. See *Commonwealth* v. *Wardwell,* 136 Mass. 164, 169; Prosser, Torts, p. 840. By the same token, facts concerning a business or other enterprise must be related to some matter which affects the public welfare. See *Crane* v. *Waters,* 10 F. 619, 621; *Bearce* v. *Bass,* 88 Me. 521, 543, 34 A. 411. It is often impossible to differentiate between what is comment and what is a statement of fact. Noel, "Defamation of Public Officers and Candidates," 49 Col. L. Rev. 875, 878; note, 110 A.L.R. 412, 429. It does not better serve justice to attempt it. We subscribe to the more liberal rule. See *Atwater* v. *Morning News Co.,* supra, 513; *Moynahan* v. *Waterbury Republican, Inc.,* 92 Conn. 331, 333, 102 A. 653. We reject the plaintiff's claim that the statement complained of was not "fair comment" and was not embraced by the rule of privilege.

The plaintiff contends further that the immunity

of privilege extends only to matters of public interest and that the affairs of a private corporation do not fall within this category. In his political appeal, DePaola was speaking about the loss of employment by the removal from Meriden of businesses which furnished that employment. Most certainly loss of employment is a matter of public interest. In *Coleman* v. *MacLennan,* supra, the court states (p. 734): "[I]t must be borne in mind that the correct rule, whatever it is, must govern in cases other than those involving candidates for office. It must apply to all officers and agents of government —municipal, state and national; to the management of all public institutions—educational, charitable and penal; to the conduct of all corporate enterprises affected with a public interest—transportation, banking, insurance, and to innumerable other subjects involving the public welfare." We accept this as the correct viewpoint. *Flanagan* v. *Nicholson Publishing Co.,* 137 La. 588, 599, 68 So. 964; *Bearce* v. *Bass,* supra; *South Hetton Coal Co.* v. *Northeastern News Assn., Ltd.,* [1894] 1 Q.B. 133, 143; note, 62 Harv. L. Rev. 1207, 1208; see *Crane* v. *Waters,* supra; *Tilles* v. *Pulitzer Publishing Co.,* 241 Mo. 609, 636, 145 S.W. 1143.

There are a number of occasions to which the rule of privilege obtains. In the instant case, the occasion was the presentation of an appeal to the voters in an election campaign and the presentation of facts which legitimately pertained to a proper issue in the campaign. The immunity of privilege is lost if the defendants can be shown to have made the claimed defamatory utterances for a purpose other than that for which the immunity was designed to afford protection. *Moore* v. *Stevenson,* 27 Conn. 14, 29; *McNally* v. *Burleigh,* 91 Me. 22, 23,

39 A. 285; *MacLean* v. *Scripps,* 52 Mich. 214, 221, 17 N.W. 815, 18 N.W. 209; Prosser, Torts, p. 850. Nothing in the facts stipulated shows that DePaola had any motive other than to state to the electorate what he honestly believed to be the situation or that the defendant company acted otherwise than to furnish its facilities for a broadcast in a political campaign. True, neither DePaola nor the defendant company investigated the truth or falsity of the statements made concerning the plaintiff. That attests rather to want of care or to thoughtlessness than to bad motives or dishonesty. A reckless disregard of the truth or falsity of facts stated in a political address and broadcast would amount to bad faith. The facts before us do not present such a case. DePaola, the candidate, relied upon information furnished by his political committee. There is nothing to indicate that he had any reason to believe that it knowingly or recklessly misinformed him. If he honestly and in good faith believed what he said, if there were grounds for such belief, and if his purpose in saying what he did was an honest desire to discharge his duty as a candidate by informing the electorate of facts which he believed to be true and expressing his views thereon, that is all that is required. *Ely* v. *Mason,* 97 Conn. 38, 44, 115 A. 479; *Barry* v. *McCollom,* 81 Conn. 293, 297, 70 A. 1035. As a matter of fact, the plaintiff concedes that there was no malice or bad faith on the part of DePaola. He cannot, therefore, be denied the defense of privilege on those grounds.

As to the defendant company, it was under a legal requirement to permit the broadcast. Power to censor the script was denied it. 48 Stat. 1088, 47 U.S.C. § 315 (1946); Donnelly, "Defamation by Radio: A Reconsideration," 34 Iowa L. Rev. 12,

30, 38 n.99; note, 61 Yale L. J. 87, 89. There is no reason why it should not be accorded the same qualified privilege as DePaola. Unless it could be shown that the defendant company maliciously permitted its facilities to be used, or that it knew that the facts stated were false and yet allowed the broadcast, or otherwise acted in bad faith, it too is shielded by the privilege. *Josephson* v. *Knickerbocker Broadcasting Co.,* 179 Misc. 787, 788, 38 N.Y.S.2d 985; *In re Application of Port Huron Broadcasting Co.,* 12 F.C.C. 1069, 1074.

We answer the questions submitted as follows: (1) By the law of libel; (3)(a) No; (4)(a) Yes; (4)(b) Yes. The view we have taken of the case makes it unnecessary to answer the remaining questions.

No costs will be taxed in this court to any party. In this opinion the other judges concurred.