**FARMERS EDUCATIONAL & COOPERATIVE UNION OF AMERICA, NORTH DAKOTA DIVISION, a corporation, Plaintiff and Appellant,**

v.

**WDAY, Inc., a corporation, Defendant and Respondent.**

No. 7710.

Supreme Court of North Dakota.

April 3, 1958.

Quentin N. Burdick, Fargo, for appellant.

Bangert & Bangert, Fargo, for respondent.

Douglas A. Anello, Walter R. Powell, Jr., Walter J. Murphy, Jr., Washington, D. C., amici curiæ.

SATHRE, Judge.

The plaintiff is a corporation duly organized and existing under the laws of the State of North Dakota, with a principal office and place of business at Jamestown, North Dakota.

The defendant, WDAY, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of North Dakota with its office and principal place of business located at Fargo, North Dakota. It is engaged in radio and television broadcasting from its studios at Fargo, North Dakota, under license duly issued by the Federal Communications Commission.

At the general election of North Dakota in 1956 Milton R. Young, Quentin Burdick, and A. C. Townley were duly qualified candidates for the office of United States senator.

Some time prior to October 29, 1956, two of said candidates for the office of U. S. senator, Milton R. Young and Quentin Burdick, made arrangements with the defendant WDAY to use and did use its facilities and equipment for the photographing and recording of political speeches related to the respective candidates which photographic film and recordings through conventional television processes were broadcast by WDAY, the defendant.

Thereafter Townley the third candidate for U. S. Senator from North Dakota requested the same opportunity to use the broadcasting facilities and equipment of the defendant WDAY as had been accorded Milton R. Young and Quentin Burdick and presented to the defendant WDAY a script of the broadcast which he proposed to make over such facilities. WDAY notified Townley that it believed certain statements in the proposed script were false and that if such statements were, in fact false, they were libelous and that it would broadcast the proposed script only if Townley demanded that it be broadcast under the provisions of Section 315 of the Federal Communication Act, the same being Section 315 U.S.Code Annotated, Title 47.

Townley made the demand under said Section 315 and the script was broadcasted through the television and radio equipment of the defendant WDAY. Among other things the script contained the following statements:

"The Farmers Union program fully carried out as planned, not as it is planned by farmer members, but as it is planned by the Farmers Union dictators, would establish a Communist Farmers Union Soviet right here in North Dakota."

"Both men take orders from Communist controlled Democrat Farmers Union and now this amazing fact— Communist infiltration and power has gone so far in North Dakota that the Democratic Party supports 100% the Democrat Farmers Union candidate and the Republican Party supports 90% the Democratic Farmers Union candidate. The Communist can't lose unless the Americans wake up and wake up fast."

"Mr. Republican farmer, Republican banker, Republican businessman, do you vote and work Republican with Eisenhower for the Republican farm

program and against the Farmers Union Soviet or do you now still walk hand in hand with communist Farmers Union dictators."

Thereafter plaintiff brought this action against the defendants claiming that the contents of the Townley script was libelous per se and that the plaintiff thereby sustained special as well as general damages by reason of the broadcast of said script.

The complaint alleges that on the 29th day of October 1956, in the evening of said day, the defendants intentionally, wilfully, maliciously, knowingly and wrongfully published, reproduced and uttered the said libelous and defamatory statements over the television and broadcasting equipment and facilities of the defendant WDAY through channel 6, at Fargo North Dakota; that the statements so published and broadcasted by the defendants were directed to the plaintiff, and were deliberately designed to and did convey to the thousands of listeners and viewers of the said false and defamatory matter, and visual image of the defendant A. C. Townley that the person or legal entity to whom said statements referred was the plaintiff, and did convey the impression to thousands of listeners and viewers that plaintiff was unpatriotic, guilty of treasonable conduct, violated the constitution and law of the land, and was engaged in illegal and immoral activities, and held the plaintiff up to ridicule, contempt and obloquy, and caused plaintiff to be shunned and injured in its occupation, and said statements so broadcasted were libel and slander per se; that plaintiff has suffered and will suffer special damages on account of loss of membership dues and contributions in the sum of $50,000 and general damages in the sum of $50,000. The defendant A. C. Townley answered admitting making the broadcast complained of, but denied that same constituted libel and slander as against the plaintiff.

The defendant WDAY answered separately and admitted that the Townley script was broadcast through its television and broadcasting facilities; but alleged as a first defense that it was absolved of any liability for any damages under the provisions of Section 14–0209, 1953 Supp. ND RC 1943, which Section is as follows:

"The owner, licensee or operator of a visual or sound radio broadcasting station or network of stations, and the agents or employees of any such owner, licensee or operator, shall not be liable for any damages for any defamatory statement published or uttered in or as a part of a visual or sound radio broadcast, by one other than such owner, licensee or operator, or agent or employee thereof."

As a second defense it alleged that under the provisions of Section 315 of the Communications Act of 1934, U.S.Code Annotated Chapter 47, it had no power of censorship; that under said statute it was its mandatory duty to publish the script complained of, and that if it should fail to comply with said statute the same would be grounds for the Federal Communication Commission to penalize the defendant by refusing to renew its license; that by reason of the premises and said Section 315 and the regulations thereunder promulgated by the Federal Communication Commission, the defendant was without fault, and entitled to a dismissal of the action. Said Section 315 is as follows:

"If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate."

The plaintiff demurred to the first defense on the grounds that it did not state facts

sufficient to constitute a defense, and that the said Section 14–0209 NDRC 1943, 1953 Supp. is unconstitutional, invalid and void in that it violates Sections 9 and 22 of the Constitution of the State of North Dakota.

Plaintiff demurred to the second defense on the grounds that if said Section 315 of the Communications Act is applicable, it does not grant immunity to the defendant WDAY, Inc., from actions for defamation, and if construed as granting immunity, said Act would be unconstitutional and void and in violation of the Fourteenth Amendment to the Constitution of the United States and would contravene the due process clause of said Amendment, and deprive plaintiff of a substantive right to protect its property, including its reputation; that if said Section 315 is applicable, it would be void and unconstitutional under the Fifth Amendment to the Constitution of the United States, and deprive plaintiff of liberty and property and a substantive right without due process of law; and that the answer does not state facts sufficient to constitute a defense.

On the issues thus framed the matter came on for hearing, pursuant to agreement by the parties, in the district court of the first judicial district, at Fargo, North Dakota, before the Honorable John C. Pollock, one of the judges of said district court. After such hearing the court made its order sustaining plaintiff's demurrer to the first defense of the defendant WDAY, but overruled the demurrer to the second defense.

No appearance was made for or on behalf of the defendant A. C. Townley.

Neither the plaintiff nor the defendant elected to plead further. The defendant WDAY, Inc., moved for judgment in its favor for dismissal of the action. The motion was granted and the court made findings of fact, conclusions of law, and ordered judgment in favor of the defendant WDAY for dismissal of the action. Judgment was entered accordingly. The plaintiff appealed from the judgment and demanded a trial de novo in this court.

■ In its order sustaining the demurrer to the first defense of the defendant WDAY the court held that Section 14–0209, 1953 Supp. NDRC 1943, was unconstitutional and void under Sections 9, 11 and 22 of the Constitution of the State of North Dakota. The defendant WDAY takes no exception to that part of the order, and therefore the question as to the constitutionality of Section 14–0209, NDRC 1943, is not before us on this appeal.

It is conceded by the defendant WDAY that the language in the Townley speech complained of by plaintiff is libelous per se; but it claims immunity under Section 315 of the Federal Communications Act. It is contended that in the matter of the Application of Port Huron Broadcasting Co. Docket No. 6987, 1948, (4RR1) the Federal Communication Commission expressed the opinion that Section 315 relieved broadcasters from liability for defamation and that such opinion had the force of law. The proviso in Section 315 prohibits censorship of the material to be broadcast in the following language:

"Provided, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section."

In the Port Huron case it appears that the Broadcasting Company had adopted a policy of selling time to the various candidates for political office and had arranged to broadcast a series of talks by three candidates. But after the station management had examined the script of one of such candidates and had discovered the allegedly libelous nature of the script, broadcast thereof was refused. The Communication Commission held that suppression of the speech was a complete exercise of censorship in violation of the provisions of Section 315.

We quote the following excerpts from the text of the opinion of Communication Commission in the Port Huron case:

"For as we read the provisions of Section 315, the prohibition contained therein against censorship in connection with political broadcasts appear clearly to constitute an occupation of the field by federal authority, which, under the law, would relieve the licensee of responsibility for any libelous matter broadcast in the course of a speech coming within Section 315 irrespective of the provisions of state law."

"Accordingly we are of the opinion that the prohibition of Section 315 against any censorship of licensees of political speeches by candidates for office is absolute, and no exception exists in the case of material which is either libelous or might tend to involve the station in an action for damages."

"In reaching this conclusion, however, we hold merely that censorship prohibited under Section 315 of the Communications Act includes the refusal to broadcast a speech or part of a speech by a candidate for public office because of the allegedly libelous or slanderous content of the speech. Nothing in this opinion is intended to indicate that a licensee is necessarily without power to prevent the broadcast of statements or utterances in violation of the provisions of the Communications Act or any other federal law on broadcasts coming within the requirements of Section 315 of the Communications Act."

From the opinion of the Commission quoted above it is clear that the Commission has taken the view that under Section 315 radio and television stations are obligated to offer equal opportunities to all candidates for public office to make use of their facilities without censorship. The Commission further contends that Congress has taken over the field in connection with responsibility for libelous matter as fully as it has with respect to responsibility of telegraph companies in transmitting interstate messages to the exclusion of local or state interference. Section 301, Subchapter III, Provisions relating to Radio, U.S.C.A. Title 47 provides:

"It is the purpose of this chapter, among other things, to maintain the control of the United States over the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." * * *

The case of Allen B. Dumont Laboratories v. Carroll, 3 Cir., 1950, 184 F.2d 153, 154, had under consideration a Pennsylvania statute, 4 P.S. Sec. 41–58, under which the Board of Censors of the state had promulgated a regulation authorizing it to censor films used by plaintiffs in projecting television programs in the State of Pennsylvania. The court below found that the regulation was in conflict with federal authority in a field fully occupied by Congress when it enacted the Radio Act of 1927, 44 Stat. 1162, and the Communications Act of 1934, 47 U.S.C.A. § 151 et seq., and found the regulation invalid. It was found that the television programs broadcast by the plaintiffs were received by persons having television sets not only in Pennsylvania but also in the State of Delaware, Maryland, New Jersey and other states. The Circuit Court of Appeals affirmed the district court and held that:

"There is no doubt but that television broadcasting is in interstate commerce. This is inherent in its very nature. * * *

"The Communications Act of 1934 applies to every phase of television and it is clear that Congress intended the regulatory scheme set out by it therein to be exclusive of State action. See Section 301, 47 U.S.C.A. § 301, which

recites the purpose of the Act as inter alia, the maintenance of ' * * * the control of the United States over all the channels of interstate and foreign radio transmission * * * ' ".

The opinion concludes: "We think it is clear that Congress has occupied fully the field of television regulation and that that field is no longer open to the States. Congress possessed the constitutional authority to effect this result. Hines v. Davidowitz, 312 U.S. 52, 74, 61 S.Ct. 399, 85 L.Ed. 581. It follows that the Commonwealth of Pennsylvania cannot censor the films used on the programs of plaintiff's station."

In the case of Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 173, 87 L.Ed. 165, the Supreme Court of the United States said:

"It is familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules. * * *

"When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield. * * *

"The federal courts have been consistent in holding that local rules of estoppel will not be permitted to thwart the purposes of statutes of the United States."

See also Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166.

■ It appears clear therefore under Section 301, supra, of the Radio Act and the decisions in the cases cited that the Congress has taken full control of interstate radio and television communication.

■ The question presented in the instant case is whether under Section 315, supra, the defendant WDAY is immune from damages for broadcasting the libelous matter contained in the speech of A. C. Townley. Said statute provides that where a licensed radio station has permitted a candidate for political office to use its facilities it must afford equal opportunities to all candidates for the same office; but "such licensee shall have no power of censorship over the material broadcast under the provisions of this section". If WDAY is immune from liability such immunity is a privilege granted by section 315, and is either an absolute privilege or a qualified privilege. 53 C.J.S. Libel and Slander § 88, page 143, defines Absolute Privilege as follows:

"An absolutely privileged communication is one for which, by reason of the occasion on which it is made, no remedy is provided for the damages in a civil action for slander or libel. It is well settled that the law recognizes this class of communications which is so absolutely privileged that even the existence of express malice does not destroy the privilege, although there are some dicta denying the rule; and some eminent judges, in dealing with particular applications of the rule, have doubted or questioned the rationale or principle of absolutely privileged communications. As to absolutely privileged communications, a civil action for libel or slander is absolutely barred."

In the same volume, § 89, pages 143, 144, 145, qualified privilege is defined as follows:

"Qualified privilege exists in a larger number of cases than does absolute privilege. It relates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has

an interest, or in respect to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice, and as to such communications there is no civil liability, regardless of whether or not the communication is libelous per se or libelous per quod."

In § 90, page 146, same volume it is stated:

"A communication must be published in connection with, and relevant and germane to, some matter involving the interest or duty. Notwithstanding the existence of a privileged occasion between the parties to a communication, an irrelevant defamatory statement concerning a third person having no connection whatever with the occasion is not privileged; but where a defamatory charge against a third person is inseparably connected with a privileged communication concerning another it will be protected by the privilege."

There is no ambiguity in Section 315, supra. It provides in clear and specific language that where candidates for political office are permitted to use the facilities of a station such station "shall have no power of censorship." There are certain exceptions "and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Beauharnais v. People of

State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 730, 96 L.Ed. 919.

In the instant case the defendant WDAY was required by Section 315 to permit the broadcast of the Townley speech. Power to censor the speech was denied by the clear and specific language of Section 315. We cannot believe that it was the intent of Congress to compel a station to broadcast libelous statements and at the same time subject it to the risk of defending actions for damages.

The defendant WDAY took the precaution to advise the speaker that if certain statements in the speech were false they were libelous, and unless the speaker would make a demand under Section 315, his speech would not be broadcast over defendant's facilities. The speech was broadcast only after such demand was made by the speaker.

The plaintiff objected specifically to the following and similar statements in the Townley speech as charging it with being a communistic organization:

"Both men (Young and Burdick) take orders from the Communist controlled Democrat Farmers Union."

The reference to "Communist controlled Democrat Farmers Union" is in context with the criticism by the speaker of his two opponents. The speaker was discussing the qualification of candidates and campaign issues in which the voting public was interested. As was said in the case of Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 116 A.2d 440, at page 445:

"Any political campaign is a process of debate and appeal publicly conducted in a way to bring knowledge to the voters to assist them in making a choice on election day. It is a time honored American institution indispensable in our way of life. Courts must be careful not to permit the law of libel and slander to encroach unwarrantably upon the field of free public debate."

When Congress enacted Section 315 it recognized the convenience and necessity of the general public and its right to information relative to political issues, the qualifications of candidates for public office, and their attitude on questions of grave importance affecting the general welfare of the state and nation.

It cannot reasonably be argued with any convincing force that the election of a United States Senator is not of vital importance under our form of government. The voters are entitled to all available information as to the character and qualification of candidates for the office. Under Section 315, supra, Congress has prescribed the conditions and limitations under which broadcasting stations may permit their facilities to be used by candidates for political office. Where candidates are permitted to use the facilities of the stations, censorship by the stations of the speeches broadcast is prohibited.

Communism is a subject that is being discussed both privately and publicly by Americans and by the people of other countries. The reference to that subject in the speech challenged by the plaintiff could do no more than to put the electorate on inquiry as to the attitude of the candidates for the United States Senate toward communism. So far as the defendant WDAY is concerned it was under compulsion to publish the speech by direct mandate of a federal statute. It had no choice other than to broadcast the speech. If the speech was libelous the plaintiff had its recourse and remedy against the author of the speech who delivered it through the facilities of the defendant WDAY.

The plaintiff contends that if said Section 315 is held to grant immunity to the defendant WDAY it would be unconstitutional and in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States. To this we cannot agree. Section 315 imposes a mandatory duty upon broadcasting stations to permit all candidates for the same office to use their facilities if they have permitted one candidate to use them. Since power of censorship of political broadcasts is prohibited it must follow as a corollary that the mandate prohibiting censorship includes the privilege of immunity from liability for defamatory statements made by the speakers. In fact the maxim "res ipsa loquitur" applies to the situation presented here. There is no provision in the Fifth and Fourteenth Amendments to the Constitution which prohibits Congress from either granting or denying a privilege. As we have pointed out elsewhere in the opinion, the manifest purpose of Congress in enacting Section 315 was to afford full opportunity to candidates for political office to give to the electorate and the public generally facts relative to their qualifications and fitness for the office to which they aspire.

The judgment of the district court is accordingly affirmed.

GRIMSON, C. J., and JOHNSON and BURKE, JJ., concur.

MORRIS, Judge (dissenting).

Radio and television broadcasting falls within the scope of federal regulatory power derived from the commerce clause of the United States Constitution, art. 1, § 8, cl. 3. Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166. It also seems that liability for libel in connection with broadcast or telecast transmissions also falls within the scope of that power. O'Brien v. Western Union Telegraph Co., 1 Cir., 113 F.2d 539. Congress, by Section 315 of the Federal Communications Act of 1934, has undertaken to regulate the use of broadcasting facilities by candidates for public office and prohibit to licensees the exercise of the power of censorship over material broadcast within the provisions of that section. The extent of that regulation and its legal consequences are matters to be determined under federal statutes in accordance with federal policy insofar as

that policy has been established. Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165.

To the extent that Section 315 deprives a licensee of the power of censorship over the material broadcast it insulates the licensee against liability for defamation. This is a corollary to the proviso of Section 315 because Congress has by the Communications Act undertaken to protect as well as regulate radio and television stations in the public interest. Therefore the power of censorship provided by Congress must be evaluated and construed in the light of both the public purpose sought to be served and the age-old right of the individual to a reputation undefamed. I find a somewhat analogous situation with respect to Article I of the Amendments to the Constitution of the United States prohibiting the abridgment of freedom of speech. Even that freedom must yield to civilized society's inherent prohibitions of blasphemy, indecency and defamation. Thus words that seem unqualified must sometimes yield to qualification.

"Power of censorship" that Section 315 prohibits is the power to deny or forbid the publication in advance or to refuse to make available facilities of the licensee for such publication. Allen B. Dumont Laboratories v. Carroll, 3 Cir., 184 F.2d 153. Despite the positive wording of the statute this prohibition cannot under all circumstances be absolute. I do not attribute to Congress an intention to deny the right of censorship to the extent of compelling the licensee to make available to a candidate for public office its facilities for the broadcasting of obscenity or blasphemy. It follows that to the extent that censorship is not absolute, privilege under the law of libel is not absolute. Once that it is conceded that the prohibition of censorship is not absolute despite its positive language we are faced with the problem of construction that involves a determination of the intention of Congress.

A number of states have by their constitutions placed reputation within the protecting mantle of the Bill of Rights. Byers v. Meridian Printing Co., 84 Ohio St. 408, 95 N.E. 917, 38 L.R.A.,N.S., 913; Osborn v. Leach, 135 N.C. 628, 47 S.E. 811, 66 L.R. A. 648; Hanson v. Krehbiel, 68 Kan. 670, 75 P. 1041, 64 L.R.A. 790, 104 Am.St.Rep. 422. See also Neafie v. Hoboken Printing & Publishing Co., 75 N.J.L. 564, 68 A. 146.

"As a part of the right of personal security, the preservation of every person's good name from the vile arts of detraction is justly included. The laws of the ancients, no less than those of modern nations, made private reputation one of the objects of their protection." Kent's Commentaries, 14th Ed. (Gould) Vol. II, p. 23.

An intention to leave all reputations at the mercy of even a limited class of defamers should not be lightly ascribed. On the other hand justice to the individual may sometimes be forced to yield to the public good. In this instance, however, Congress in enacting Section 315 was not faced with a Hobson's choice and in construing that section neither are we.

When a person becomes a candidate for a public office he submits himself to a limited privilege on behalf of those who would comment on his fitness for office. Nevada State Journal Publishing Co. v. Henderson, 9 Cir., 294 F. 60; 33 Am.Jur., Libel and Slander, Section 169, 53 C.J.S. Libel and Slander § 134 b. This rule springs from the fact that when a person becomes a candidate for public office his reputation for honesty and integrity as well as his qualifications and fitness for the position become matters of public interest. Radio and television licensees are mediums for the broad distribution of information. I have no difficulty in concluding that Congress by the enactment of Section 315 prohibited censorship of the material broadcast under the provisions of that section on the ground that it was defamatory of a candidate for the same office who had pre-

viously been permitted to use the broadcasting station. Perhaps Congress intended to go so far as to prohibit censorship of the broadcast of matter defamatory of any candidate for the same office. But what of the innocent bystander?

The innocent bystander may stand in one of two categories depending on the relationship if any between the defamatory matter and the rest of the broadcast. A defamatory statement may be a digression from the political theme and have no connection with any opposing candidate. Surely Congress did not intend that a candidate broadcasting under the protection of Section 315 might charge his neighbor, John Doe, with being a thief out of context and with no relation to the campaign or to opposing candidates, free of any right of the licensee to censor the defamatory statement and consequently without recourse against the disseminator on the part of the person so defamed. To that extent at least the prohibition against censorship must yield. In a second and slightly different category stands the innocent bystander whose defamation is in context and is connected by words of the broadcast with an opposing candidate. An illustration would be where a candidate is broadcasting under the provisions of Section 315 and accuses an opposing candidate of associating with thieves, one of whom is neighbor John Doe. Here again the neighbor is defamed but the defamation is by context connected with the candidate as well. This case falls within the general purview of the second illustration. The defamatory accusation that the plaintiff is Communist-controlled is connected by context with the two candidates opposing A. C. Townley, whose speech was telecast after being filmed, recorded and viewed by the employees of the defendant, WDAY, Inc. The plaintiff is an innocent third party whose reputation has been defamed under the claimed protection of the prohibition against censorship contained in Section 315. It does not appear that the public interest would be served by making the reputations of innocent third parties

subject to destruction without recourse to the disseminator by an irresponsible candidate for public office broadcasting under the aegis of Section 315 or that Congress intended licensees to be rendered powerless to prevent such a result.

I am not impressed by the argument that because Townley was the primary source of the defamatory material and the licensee was merely the agency of transmission or publication Congress felt that recourse to the author afforded sufficient relief. This argument ignores the fact that defamation acquires its devastating effect through dissemination rather than authorship and that under the law of libel damages are awarded not for the utterance but for the effect.

My conclusion is that Section 315 does not afford the defendant, WDAY, Inc., a defense in law and that the trial court erred in overruling the demurrer to the second defense.