Lawrence HOGAN and Thomas Maloney,
Plaintiffs-Appellees,

v.

**NEW YORK TIMES COMPANY,**
Defendant-Appellant.

No. 169, Docket 27768.

United States Court of Appeals
Second Circuit.

Argued Jan. 9, 1963.

Decided Feb. 8, 1963.

Frank E. Callahan, of Wiggin & Dana, New Haven, Conn. (S. Robert Jelley, of Wiggin & Dana, New Haven, Conn., on the brief), for defendant-appellant.

Donald F. Zezima, of Macrides, Zezima & Schwartz, Stamford, Conn. (Ronald M. Schwartz and Gerald J. Sullivan, of Macrides, Zezima & Schwartz, Stamford, Conn., on the brief), for plaintiffs-appellees.

Before CLARK, KAUFMAN, and HAYS, Circuit Judges.

CLARK, Circuit Judge.

On October 3, 1958, the Stamford Advocate, a Connecticut afternoon paper with a local circulation of about 25,000, reported a dice game raid which the Stamford police had made in the early morning hours of that day. Borrowing a flower company's truck to avoid suspicion, the police advanced to the scene and picked up about 10 players. At this point, according to the article, the decoy became a bane rather than a boon, for as the captives were loaded into the back

of the truck, they exited out the front. The report tells of the eventual apprehension of four of the players, but not until after several chases and scuffles during which Patrolman Maloney, one of the plaintiffs, aiming his night stick at someone else, accidentally hit Patrolman Hogan, the other plaintiff, and in the course of which four night sticks were lost.

Richard H. Parke, the New York Times staff correspondent in Fairfield County and head of that paper's Fairfield County Bureau, thought the raid story might make good copy for the Times. The extent of Parke's efforts to check the accuracy of the story consisted of four telephone calls, only one of which yielded even the slightest information about the report. The three unsuccessful calls were to Julian Schwartz, the Times correspondent in Stamford, from whom Parke got no information; Chief Kinsella of the Stamford Police Department, whom Parke was unable to reach; and the man on the desk at Stamford Police Headquarters, who apparently was unable to help him. Parke then called Wayne Tyson, a reporter whom he knew at the Stamford Advocate and who told him that the story in question was written by the Advocate's police reporter, Len Massell. Content with the information given him by Tyson and his knowledge of Massell's reputation, Parke checked no further, but began "dressing up" the Advocate article for Times consumption. He added dialogue and divided the report into three "scenes." The story thus rewritten was published the next day, October 4, 1958, under the headline: "Dice Raid in Stamford Follows The Script of a Keystone Comedy." It was given front page coverage, adjacent to a picture of Pope Pius XII greeting Cardinal Spellman, and shared the lead page with the more usual Times fare, such as items involving President Eisenhower and Premier Charles de Gaulle, Messrs. Meany and Wagner, and nuclear talks and space research.

The two patrolmen mentioned by name in the item brought an action of libel in the court below. See D.C.Conn., 211 F.Supp. 99. They alleged that Patrolman Maloney did not hit Patrolman Hogan with a night stick or in any other way, that none of the suspects escaped custody as stated in the article, that four night sticks were not missing after the raid, and that the raid was not a Keystone Cop comedy, as it was portrayed by the item. Judge Timbers implicitly accepted plaintiffs' allegation about the falsity of the article by ruling that it was libelous per se, as a matter of law.[1] This ruling is not contested on appeal. Nor are the district court's rulings that the story was published on an occasion of privilege and that the tardy retraction requested by the plaintiffs was ineffective to relieve them of the necessity of proving malice in fact if they were to recover anything but special damages contested here. Under an exceedingly informative set of instructions, Judge Timbers submitted to the jury the questions whether the defendant had abused its privilege and whether plaintiffs had been damaged. The jury returned a verdict of $6,020 for plaintiff Hogan and $6,125 for plaintiff Maloney, and judgment was accordingly entered. The substance of the New York Times' contentions on appeal is that it was entitled to prevail as a matter of law (either in the form of a directed verdict or a judgment n. o. v.) on the ground that the evidence of malice was insufficient to allow plaintiffs to go to the jury, and thus the newspaper's qualified privilege was not defeated.

We believe that sufficient evidence existed to sustain the jury verdict on either of the two possible grounds upon which its decision that defendant abused its qualified privilege might have been based: (1) improper purpose in

---

1. In Connecticut, as in most jurisdictions, truth is a complete defense to a libel action. Thus, for a publication to be libelous in any sense, it must be false. Corsello v. Emerson Bros., 106 Conn. 127, 137 A. 390 (1927); Proto v. Bridgeport Herald Corp., 136 Conn. 557, 72 A.2d 820 (1950); 1 Harper & James, The Law of Torts § 5.20 (1956).

publishing the article, or (2) reckless disregard for the truth or falsity of the story, amounting to bad faith. Certainly the evidence is sufficient to sustain a finding that the Times' sole purpose in publishing the article was to amuse its readers at the expense of the plaintiffs. That the New York Times, a newspaper of international pre-eminence, devoted to extensive reporting of important current events, should find the raid of an open-air crap game in Stamford to constitute news fit to print—and on the front page at that—is quite enough evidence by itself. It is irrefutable that this story was not as newsworthy as were its companion articles on the front page; it was obviously there only for its entertainment value. Noting particularly the setting of the item, we find it difficult to be impressed by the belated suggestion that the purpose of publication was the benevolent one of commenting on small town police ways with crapshooters or at least that the jury must so find. Moreover, it was already stale news, having appeared the day before in the local Connecticut paper. Finally, Parke's treatment—dressing the story up with scenario and dialogue and referring to the Keystone Cops of comic fame in both the story and the headline—removes any doubt that the article was intended as ridicule.[2]

■ But in addition we hold that the plaintiffs were entitled to go to the jury on the issue of reckless disregard of the truth. Whether reliance on a single telephone call to a reporter other than the author of the story—where the office of the Stamford Advocate was only a few hundred yards from Parke's office, where the town hall was merely across the street, where time was not of the essence, and indeed where there was no need that the story be written at all—would, for us, imply reckless disregard of the truth or falsity of the report, amounting to bad faith, we need not decide. For it is within the province of the jury to determine if the precaution taken by Parke in the situation presented by this case was adequate.

■ Defendant's reliance upon Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 116 A.2d 440 (1955), is misplaced. There a candidate for mayor of Meriden, in a radio speech given during the closing day of his campaign, cited the plaintiff's supposed economic distress as an example of the general economic difficulties the town was experiencing due to the incumbent administration's indifference and neglect. The Connecticut Supreme Court of Errors held that defendant had not shown reckless disregard by relying on information supplied him by his political advisory committee. But the degree of precaution that might be expected of a candidate for elective office, in the heat of the campaign, *is surely not* the appropriate standard against which to measure the care that should be exacted of an experienced newspaper reporter in the circumstances of Parke, described above.[3] Proto v. Bridgeport Herald Corp., 136

2. Although some jurisdictions have required good motives and justifiable ends as a prerequisite of the use of truth as a defense, Connecticut is not among them. See 1 Harper & James, The Law of Torts § 5.20, nn. 6–7 and accompanying text (1956). Consequently a defendant could ridicule the plaintiff in a libel action with impunity *provided* the published item were true. See note 1 supra.

The defense of fair comment—applicable in cases involving the publication of critical *opinions*—is not available here because the article clearly implies a *factual* basis. 1 Harper & James, The Law of Torts § 5.28 at 458 (1956). In the context of this case, the suggestion that fair comment, including, of course, ridicule, is *privileged* if the factual basis is either true or *privileged* both states a tautology and begs the question at issue, namely, whether the Times abused, and thereby defeated, its qualified privilege.

3. Neither of the Connecticut cases cited to the contrary involves newspapers. Barry v. McCollom, 81 Conn. 293, 70 A. 1035 (1908), concerns a report by a superintendent of public schools to the school board about the efficiency and qualifications of one of the teachers. In Ely v. Mason, 97 Conn. 38, 43, 115 A. 479, 481 (1921), a tenant told his landlord that the latter's wife had been stealing his prop-

Conn. 557, 72 A.2d 820 (1950), supports this conclusion. In that case a newspaper article accused the plaintiff of engaging in black-market trading and tie-in sales. The defendant newspaper had relied upon information obtained by a reporter from reading a police report and attending a hearing in the City Court of New Haven in proceedings against a black-marketeer who claimed to have had dealings with the plaintiff in the libel action. While an official judicial proceeding would seem a more reliable news source than an unverified article in another newspaper, the Supreme Court of Errors upheld the judgment for the plaintiff against the defendant's contention, *inter alia*, that the evidence was insufficient to establish malice, which requires that all the circumstances connected with the preparation and publication of the defamatory item be considered and weighed in ascertaining whether malice in fact was present. See also Corsello v. Emerson Bros., 106 Conn. 127, 130–131, 137 A. 390, 392 (1927).

Hence we see no occasion for rejecting the reasoned conclusion of a properly instructed jury. The jury must be permitted to perform its historic fact-finding function without unwarranted interference by the court. The judgment is affirmed.

HAYS, Circuit Judge (dissenting).

Since I believe that the evidence in this case was insufficient to go to the jury on the issue of abuse of privilege, I would reverse the judgment below and remand for dismissal of the complaint.

Once the court had determined that the libelous article was published by the defendant on an occasion of privilege, the burden of proving that the privilege had been abused was on the plaintiff. Ely v. Mason, 97 Conn. 38, 115 A. 479 (1921). Under Connecticut law, this burden is a heavy one. The standard governing sufficiency of the evidence to go to the jury on this issue was set forth in Somerville v. Hawkins, 10 C.B. 583, 138 Eng.Rep. 231 (1851), and approved by the Connecticut Supreme Court of Errors in Ely v. Mason, 97 Conn. 38, 43, 115 A. 479, 481 (1921):

> "It is true that the facts proved are consistent with the presence of malice, as well as with its absence. But this is not sufficient to entitle the plaintiff to have the question of malice left to the jury; for, the existence of malice is consistent with the evidence in all cases except those in which something inconsistent with malice is shewn in evidence: so that, to say, that, in all cases where the evidence was consistent with malice, it ought to be left to the jury, would be in effect to say that the jury might find malice in any case in which it was not disproved —which would be inconsistent with the admitted rule, that, in cases of privileged communication, malice must be proved, and therefore its absence must be presumed until such proof is given. * * * [I]t is necessary that the evidence should raise a probability of malice, and be more consistent with its existence than with its non-existence." 138 Eng.Rep. at 234.

Plaintiff did not establish a "probability" that defendant acted in "reckless disregard" of the truth or falsity of the story. Under the Connecticut rule

> " '[i]t is not essential in order to invoke the protection of a privileged communication that the defendant should have had what might seem to the trier to be "good reasons" or "reasonable grounds" for believing that the statements made by him were true; it is enough if he honest-

---

erty. In support of its holding that the representation had been made on an occasion of qualified privilege, and before discussing whether or not the privilege had been abused, the court cited Somerville v. Hawkins, 10 C.B. 583, 138 Eng. Rep. 231 (1851), and merely noted parenthetically that the English case was "instructive" regarding proof of malice, a cursory mention hardly amounting to extensive reliance.

ly believed them to be true and made them in good faith,' on an occasion of privilege to discharge a duty or protect his interest."

Ely v. Mason, 97 Conn. 38 at 44, 115 A. at 481 (1921). See Barry v. McCollom, 81 Conn. 293, 70 A. 1035 (1908).[1] While Parke's investigation may have been careless, there was no proof whatsoever that he did not believe his article to represent the truth.

In light of the rule set forth in the Barry and Ely cases, supra, I cannot agree that Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 116 A.2d 440 (1955) may properly be limited to situations involving defamatory statements by candidates for public office. That the Connecticut court did not view its holding so narrowly is demonstrated by its use of authority.[2] And I am unable to understand why a newspaper should be held to a higher standard of honesty and care than is a candidate for public office.[3]

It is also contended that by holding appellees up to ridicule, the Times transcended the bounds of fair comment. But as the majority implicitly recognizes, the evidence must demonstrate that the Times' sole purpose was to amuse its readers. Since the presence of a legitimate additional purpose (comment on police methods) was at least equally consistent with the evidence, the case should have been dismissed. Somerville v. Hawkins, supra.

The majority further recognizes that a defendant "could ridicule the plaintiff in a libel action with impunity" if the published item were true. But this states the rule too narrowly. Fair comment, including ridicule, is privileged if the published item commented upon is true, or privileged. 3 Restatement, Torts § 606, comment b at 277; 1 Harper & James, Torts § 5.28 at 456 (1956). Once the statement commented upon is shown to be privileged, "mere exaggeration, slight irony, or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitations of fair comment." Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers, 260 N.Y. 106, 118–119, 183 N.E. 193, 198 (1932). "The fact that the criticism is fantastic is immaterial, and the extravagant form of its expression is unimportant." 3 Restatement, Torts § 606, comment c at 277 (1938). "Fair comment may be severe and may include ridicule, sarcasm, and invective." Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 61, 80 N.E.2d 16, 19 (1948). "Fitting strictures, sarcasm, or ridicule, even, may be used * * *." Cherry v. Des Moines Leader, 114 Iowa 298, 304, 86 N.W. 323, 325, 54 L.R.A. 855 (1901).

It seems to me to be important to maintain unimpaired the privilege of poking fun at public officials.

For these reasons, I respectfully dissent.

1. While this may represent the minority viewpoint, see Prosser, Torts 628 (2d ed. 1955), we are, of course, bound by the Connecticut rule. Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

2. See 142 Conn. at 618, 116 A.2d at 446, where the court relied particularly on Ely v. Mason, supra, and Barry v. McCollom, supra, neither of which involved candidates for public office.

See also its use at 142 Conn. 617, 116 A.2d 445–446 of Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361 (1908).

3. Proto v. Bridgeport Herald Corp., 136 Conn. 557, 72 A.2d 820 (1950) is not to the contrary. There the libel consisted of a report that plaintiff had engaged in black market dealings and made "tie-in sales." The opinion makes clear that the defendant newspaper had no information regarding this aspect of the article. 136 Conn. at 560–561, 72 A.2d at 823.